```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3   Case No. 14-cr-00281-CMA

 4   _____

 5   UNITED STATES OF AMERICA,

 6        Plaintiff,

 7   vs.

 8   ALAN TIMOTHY HERSHEY and RENEE MOLINAR,

 9        Defendants.

10   _____

11            Proceedings before BOYD N. BOLAND, United States

12   Magistrate Judge, United States District Court for the

13   District of Colorado, commencing at 10:09 a.m., July 17,

14   2014, in the United States Courthouse, Denver, Colorado.

15   _____

16            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   _____

19                        APPEARANCES

20            LINDA KAUFMAN, Assistant United States Attorney,

21   appearing for the government.

22            MICHAEL ARVIN, Attorney at Law, appearing for the

23   defendant Alan Timothy Hershey.

24   _____

25            ARRAIGNMENT/DETENTION/DISCOVERY HEARING
```

```
 1                    APPEARANCES (Cont'd)
 2              AMANDA CRUSER, Attorney at Law, appearing for the
 3    defendant Renee Molinar.
 4                    P R O C E E D I N G S
 5              (Whereupon, the within electronically recorded
 6    proceedings are herein transcribed, pursuant to order of
 7    counsel.)
 8              (Whereupon, in several instances counsel were not
 9    speaking in a microphone and the text is inaudible.)
10              THE CLERK:  All rise.  Court is in session.
11              THE COURT:  Thank you.  Please be seated.  This is
12    case 14-cr-281, United States of America versus Alan Timothy
13    Hershey and Renee Molinar.  For the United States?
14              MS. KAUFMAN:  Good morning, Your Honor.  Linda
15    Kaufman on behalf of the United States, and with me today is
16    Special Agent Mike Garvey of the IRS.
17              THE COURT:  Thank you.  For Mr. Hershey?
18              MR. ARVIN:  Good morning, Your Honor.  Michael
19    Arvin representing Alan Timothy Hershey.  Mr. Hershey is
20    present with me in the courtroom in custody.
21              THE COURT:  Thank you.  And for Miss Molinar?
22              MS. CRUSER:  Yes, Your Honor.  I'm Amanda Cruser
23    and I am here with my client, Renee Molinar.
24              THE COURT:  Thank you.  This matter is set for
25    arraignment, discovery, and detention.  On the issue of
```

1    arraignment, Mr. Arvin, has your client received a copy of

2    the indictment?

3            MR. ARVIN:  Yes, Your Honor.

4            THE COURT:  Does he wish to have it read in its

5    entirety?

6            MR. ARVIN:  No, Your Honor, waive reading.

7            THE COURT:  I'll accept a plea.

8            MR. ARVIN:  Not guilty.

9            THE COURT:  I'll accept a plea of not guilty to

10   each of the counts charged against Mr. Hershey, order the

11   matter continued for further proceedings.

12           And, Miss Cruser, has your client received a copy

13   of the indictment?

14           MS. CRUSER:  She has, Your Honor, and we waive --

15   waive reading at this time.

16           THE COURT:  And I'll accept a plea?

17           MS. CRUSER:  Not guilty.

18           THE COURT:  I'll accept a plea of not guilty to

19   the count charged against Miss Molinar, order the matter

20   continued for further proceedings.  Miss Molinar previously

21   was released on conditions.  We have detention as to

22   Mr. Hershey.  Miss Kaufman?

23           MS. KAUFMAN:  United States calls Mike Garvey.

24           THE COURT:  Special Agent, if you'd approach the

25   witness stand and raise your right hand, please.

1          MIKE GARVEY, GOVERNMENT WITNESS, SWORN

2          THE COURT:  Thank you.  Please be seated.  State

3     your full name and spell your last name, please.

4          THE WITNESS:  My name is Mike Garvey, last name is

5     spelled G-a-r-v-e-y.

6          THE COURT:  Miss Kaufman?

7          MS. KAUFMAN:  Thank you.

8                    DIRECT EXAMINATION

9     BY MS. KAUFMAN:

10    Q     Good morning, Mr. Garvey.  How are you employed, sir?

11    A     I'm a Special Agent with the Internal Revenue Service,

12    criminal investigation division.  I've been employed there

13    since 2003.

14    Q     Were you -- are you the case agent in the case that's

15    now before the Court?

16    A     I am.

17    Q     And in -- have you spent a substantial amount of time

18    investigating Timothy Hershey and the events forming the

19    basis of -- of the indictment charged?

20    A     Yes, I have.

21    Q     Did that include reviewing voluminous bank records,

22    interviewing numerous witnesses, reviewing IRS documents,

23    reviewing materials received from witnesses, public records,

24    and other business records?

25    A     Yes.

1    Q      Are you aware of any real estate owned by the

2    defendant, Timothy Hershey, in the State of Colorado?

3    A      No, I'm not.

4    Q      Are you aware of any real estate owned by Timothy

5    Hershey elsewhere?

6    A      No.

7    Q      What do you know about vehicles that he has been

8    driving?

9    A      The vehicles that he has been driving are registered to

10   other people, including Renee Molinar or his girlfriend, Pam

11   Long.

12   Q      The most recent, to whom is it -- what vehicle is it

13   and to whom is it registered?

14   A      It's a 2001 Dodge Ram truck and it's registered to Pam

15   Long.  And Mr. Hershey also drove a Hummer H2 that was

16   registered to Renee Molinar.

17   Q      To whom was the Dodge pickup truck registered prior to

18   being registered to Pam Long, do you know?

19   A      Renee Molinar.

20   Q      What was Renee Molinar's relationship with the

21   defendant starting as far back as 1998?

22   A      They were boyfriend and girlfriend.

23   Q      Did they live together for a period of years?

24   A      They did.

25   Q      Do you know of any vehicles that are registered in the

1    defendant's own name?

2    A    I do not.

3    Q    What do you know, if anything, about telephone numbers

4    that he has used?

5    A    He has used cell phones that were registered in other

6    people's names, including Charles Reichert.

7    Q    Who is Charles Reichert?

8    A    Charles Reichert is an unindicted co-conspirator in

9    this case.

10   Q    Is he referred to in the indictment under the initial

11   C.R.?

12   A    He is.

13   Q    Did he work for Mr. Hershey for a number of years?

14   A    Yes, he did.

15   Q    What do you know, if anything, about the defendant's

16   use of credit cards and/or his credit history?

17   A    I obtained the defendant's credit history from Equifax

18   and Equifax told me that there was no credit history for

19   Mr. Hershey according to their records.

20   Q    Has the defendant Hershey filed any federal income

21   taxes, tax returns in the recent past?

22   A    The last filed return for Mr. Hershey according to the

23   IRS records is for 1984.

24   Q    And about how old was he at that time?

25   A    19.

1    Q    How old is he now?

2    A    49.

3    Q    Do you have any reason to believe that Mr. Hershey has

4    access to large amounts of cash and/or other commodities

5    easily converted into cash?

6    A    I do.

7    Q    Just focusing now for the period of 2001 to 2011, what

8    is the basis of your belief generally?

9    A    It's my belief that Mr. Hershey had access to the

10   skimmed cash receipts from the Johnstown Liquor.  He would

11   instruct Miss Molinar on a daily basis how much cash to

12   remove and that cash was given to Mr. Hershey.

13   Q    Did Mr. Hershey -- who owned the Johnstown Liquor?  Is

14   -- first of all, is Johnstown Liquor still in operation?

15   A    It is.

16   Q    And who owned it in 1997?

17   A    Mr. Hershey did.

18   Q    Did he have a liquor license at that time?

19   A    He did.

20   Q    And had he had one and operated it for some years prior

21   to that?

22   A    Yes.

23   Q    Did he have a problem in 1997 with the state

24   authorities regarding licensing?

25   A    He did.  Mr. Hershey was caught purchasing stolen beer

1    and he was forced to sell the license to a bona fide

2    purchaser or have it revoked.

3    Q    And was he -- was the stolen beer purchased from

4    employees of a distributor?

5    A    It was.

6    Q    Did he also run afoul of turning over business records

7    as required?

8    A    Yes.  He was required to turn over some records and he

9    failed to do so.

10   Q    To whom did he then transfer the business?

11   A    The business was transferred to Renee Molinar in 1998.

12   Q    Did he lose his license at that time?

13   A    He did.

14   Q    Was he precluded by the order entered from working at

15   that liquor store?

16   A    He was.

17        THE COURT:  So you're saying he lost his license,

18   he sold his license, did he?

19        THE WITNESS:  He sold it to Renee Molinar.  Yes.

20        THE COURT:  Thank you.

21   Q    (BY MS. KAUFMAN) Did -- from that point forward until

22   about November of 2011 did Renee Molinar hold herself out as

23   the owner of Johnstown Liquor?

24   A    She did.  There was a brief period of time where the

25   liquor store was sold to another individual and then Miss

1    Molinar reacquired the business in 2001, and from 2001 to

2    2011 she operated the business according to the records for

3    the Liquor Board.

4    Q    And during that period based on witness interviews and

5    other evidence you've examined, what role did Timothy Hershey

6    play in the operations of Johnstown Liquor?

7    A    Mr. Hershey operated the business behind the scenes.

8    He would instruct Charles Reichert or Renee Molinar on a

9    daily or weekly basis, sometimes he would visit the business,

10   other times he would contact Mr. Reichert or Miss Molinar on

11   the phone about how to operate the business.

12   Q    What was -- excuse me.  In what forms did Johnstown

13   Liquor receive payment for the goods it sold at the store for

14   the period of the time of the conspiracy?

15   A    Johnstown Liquor received payments via cash, check or

16   credit card.

17   Q    And what have you learned that Renee Molinar would do

18   at the end of the day with the cash receipts from Johnstown

19   Liquor during that period?

20   A    Miss Molinar would remove a substantial amount of cash

21   from the cash receipts according to the instructions that

22   were given to her by Mr. Hershey.

23   Q    Would she prepare bank deposit slips and make deposit

24   into the business account?

25   A    Yes.

1    Q    Did those deposits include the checks that were payable

2    to Johnstown Liquor as well as credit card receipts?

3    A    Yeah.  They included checks payable to Johnstown Liquor

4    and a small amount of cash.

5    Q    Okay.  And were the receipts from the credit cards also

6    deposited to the bank or does it not work that way?

7    A    They were electronically deposited into --

8    Q    All right.

9    A    -- the bank account.

10   Q    All right.  For example, for the period of time from

11   2007 through 2010 have you examined the business bank records

12   to determine what was the amount of cash deposited from the

13   gross receipts of the business during those four years?

14   A    Yes, I have.

15   Q    What was that amount?

16   A    Approximately $470,000.

17   Q    And how much did Johnstown Liquor actually take in in

18   gross receipts in cash during that same period, 2007 through

19   2010?

20   A    Johnstown Liquor took in in cashed receipts

21   approximately $4.5 million.

22   Q    And so based on the evidence that you've reviewed was

23   the difference then what you call skimmed off, taken by Miss

24   Molinar and given to Mr. Hershey?

25   A    Yes.  The undeposited cash in this case for that time

1    period is approximately $4 million.

2    Q    How do you know what the actual gross receipts of cash

3    were or the goods sold during that period of time?

4    A    In May of 2013 Charles Reichert provided me a copy of

5    the point of sale records for the Johnstown Liquor.  It

6    includes the -- the Keystroke point of sale software program

7    which reflected every single sale out of the Johnstown Liquor

8    for the time period from 2001 until approximately August of

9    2011.

10   Q    And did he leave the employ there in September 2011?

11   A    He did.

12   Q    Did -- excuse me.  Did Mr. Hershey and Miss Molinar use

13   a double set of books operating Johnstown Liquor for the

14   period of the conspiracy?

15   A    They did.

16   Q    Can you explain what the different -- difference was

17   and what the two sets of books were?

18   A    I can.  The first set of books consists of the

19   Keystroke point of sale software which reflects every single

20   sale and the cost of goods sold for the time period.  The

21   second set of books consisted of a QuickBooks software

22   program and in that program the majority of the cash was

23   removed and that program was designed to mirror or match up

24   with the bank records as well as with the Colorado State

25   sales tax returns that were filed for the business.

1   Q    And so on the -- the Keystroke point of sale, was that

2   program set up by computer with the actual cash register

3   sales item by item?

4   A    It was.  It was hooked into the cash register.  It

5   would allow the business to track their inventory as well as,

6   you know, what was sold on a daily basis.

7   Q    And the QuickBooks, who -- who prepared the QuickBooks

8   reports that you've described which eliminated the dollars

9   that were skimmed off cash?

10  A    The QuickBooks was kept by Charles Reichert.

11  Q    And according to Mr. Reichert, at whose direction?

12  A    It was kept at Mr. Hershey's direction.  Mr. Hershey

13  would instruct Miss Molinar about how much cash to remove on

14  a daily basis.  Miss Molinar would then inform Mr. Reichert

15  about how much cash to take out of the figures that were

16  entered into the QuickBooks program.

17  Q    Were you able to determine what the defendant did --

18  both defendants did with some of the cash that you've

19  described, the $4 million plus just for the years 2007 to

20  2010?

21  A    I have.  They used the cash to acquire properties in

22  Johnstown, Milliken, and businesses in Gilcrest and Greeley,

23  Colorado, other liquor businesses.

24  Q    Who negotiated most of those purchases?

25  A    Mr. Hershey.

1    Q    And do you know that from talking to the sellers of

2    those properties?

3    A    I do.  I spoke with the sellers and in some cases I

4    also spoke with the purchasers when the businesses were

5    resold about who those people dealt with when they bought the

6    business.

7    Q    And what did they tell you?

8    A    They told me they dealt with Mr. Hershey.

9    Q    In what medium of exchange were those residences that

10   you've described purchased?

11   A    They were purchased for cash.

12   Q    In whose name?

13   A    In the names of Charles Reichert, Thea Seal, Tina

14   Stinint, Renee Molinar.

15   Q    And have you interviewed Thea Seal and Tina Stinint?

16   A    I have.

17   Q    Did they tell you whose money was used to purchase

18   those properties?

19   A    They told me it was Mr. Hershey's money that was used

20   to purchase the properties.

21   Q    And did they tell you generally why they did that?

22   A    They did it at Mr. Hershey's direction because he asked

23   them to.

24   Q    Were the transfers of funds that led up to the

25   purchases of those properties in cash in some instances

```
 1    structured so as to avoid the bank's reporting requirements

 2    of deposits or withdrawals of $10,000 or more to the IRS?

 3    A    They were.

 4    Q    Did defendant Hershey also arrange for -- do you

 5    sometimes call those people that you've named as the buyers

 6    nominees?

 7    A    Yes.

 8    Q    And why do you call them that?

 9    A    Because they were the holder of the asset in name only.

10    They weren't the true owner of that asset or business.

11    Q    Were a number of those properties rental properties?

12    A    They were.

13    Q    And who received the rents from those properties?

14    A    Mr. Hershey.

15    Q    Did Miss Molinar also receive some of that?

16    A    She did.

17    Q    Did Mr. Hershey also arrange for -- for the -- one or

18    more of these nominees to buy two other liquor businesses

19    during the period of the conspiracy?

20    A    He did.

21    Q    What were those businesses?

22    A    Gilcrest Liquor in Gilcrest, Colorado, and Liquor Plus

23    in Greeley, Colorado.

24    Q    And who was the purchaser of Gilcrest Liquor?

25    A    The purchaser of Gilcrest Liquor was Tina Stinint.
```

1    She --

2    Q    And -- go ahead.  And how about Liquor Plus?

3    A    Liquor Plus was purchased -- the business was purchased

4    by Thea Seal.

5    Q    And were the properties upon which those businesses

6    were situated also purchased by nominees as you call them?

7    A    They were.  The land for the Gilcrest Liquor was

8    purchased by Charles Reichert and the -- I'm sorry, Thea

9    Seal, and the land for the Liquor Plus was purchased by

10   Charles Reichert.

11   Q    Were those businesses and properties -- most of the

12   properties ultimately resold?

13   A    They were.

14   Q    And to whom did the proceeds -- to whom were the

15   proceeds ultimately paid?

16   A    They were paid to Tim Hershey.  They were withdrawn in

17   the form of cash from the accounts that they were deposited

18   into.

19   Q    Did Renee Molinar also end up withdrawing a large

20   amount of cash as a result of this which we'll go into in a

21   minute?

22   A    She did, approximately $550,000.

23   Q    Let's talk just about a few of those properties.  The

24   first is 1914 Ruddy, R-u-d-d-y, Court, Johnstown, Colorado.

25              MS. KAUFMAN:  And may I approach the witness, Your

1    Honor?

2              THE COURT:  You may.  Do the defense counsel have

3    these materials?

4              MS. KAUFMAN:  Yes, sir.  I'll hand them out.

5              THE COURT:  Thank you.

6    Q    (BY MS. KAUFMAN) Can you identify Exhibit 1 for the

7    Court, please?

8    A    I can.  It's a summary of the funds that were used to

9    purchase the property on Ruddy Court.  On the bottom half of

10   the page are deposits into Charles Reichert's CBRI, Inc. bank

11   account.  You can see there's five consecutive deposits of

12   $9,999 between August 1st and August 5th, a transfer from an

13   account of Renee Molinar and another transfer from an account

14   Renee Molinar d/b/a Johnstown Liquor both on the 8th of

15   August.  Those -- those funds were used to purchase a

16   cashier's check that was used to pay off a loan of the owner

17   for the Ruddy Court property before it was transferred to

18   CBRI, Inc.

19   Q    Is CBRI, Inc. an entity created by Charles Reichert?

20   A    It is.

21   Q    Did Renee Molinar or Johnstown Liquor or Timothy

22   Hershey have any disclosed interest in the property purchased

23   at Ruddy Court?

24   A    No.

25             THE COURT:  Thank you.

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

```
 1    Q     (BY MS. KAUFMAN) Directing your attention to what's
 2    been marked as Exhibit 2 -- oh, excuse me.  I have some more
 3    questions about Ruddy Court.  Who is Mr. Thompson?
 4    A     Mr. Thompson was the seller of the Ruddy Court
 5    property.
 6    Q     And what did he tell you about what he saw at Johnstown
 7    Liquor when he was discussing the sale of that property with
 8    codefendant Molinar?
 9    A     He told me that Miss Molinar wanted to purchase the
10    property, that it would have to be for cash, and Mr. Thompson
11    was skeptical about this property being purchased for cash
12    because it was worth a fair amount of money.  He then
13    accompanied Miss Molinar to the back of the store where Miss
14    Molinar showed him a safe full of cash.
15    Q     Let's move onto 512 12th Strreet, Gilcrest, Colorado.
16    And could you identify what you see there in Exhibit 2?
17    A     Yes.  This is a summary of the deposits into the CBRI,
18    Inc. bank account to generate the funds that were used to
19    purchase a cashier's check payable to the mortgage holder of
20    the seller of the property, Greenpoint Mortgage.  The seller
21    of the property in this instance was Michael Bodomdistal
22    (phonetics).  The summary indicates the balance in the
23    account on August 8th, 2005 of approximately $1,000 and then
24    four cash deposits of $9,999 between the 16th and the 19th,
25    and then two transfers on the 19th of 30 and $57,000 from
```

1    accounts under the control of Renee Molinar.

2    Q    Was CBRI then the purchaser of this property?

3    A    It was.

4    Q    And who did Charles Reichert tell you provided the

5    $9,999 each time?

6    A    He told me those funds were provided by Mr. Hershey.

7    Q    Did either Mr. Hershey or Miss Molinar or Johnstown

8    Liquor have any interest of record -- on public record of

9    ownership of this 12th street property?

10   A    No.

11   Q    Who is Mr. Bodomdistal?

12   A    Mr. Bodomdistal was the seller of the 512 12th Strreet

13   property.  He told me that he had a conversation with

14   Mr. Hershey in the Gilcrest Liquor store about selling this

15   property to Mr. Hershey for cash and Mr. Bodomdistal was,

16   again, skeptical about this particular arrangement.  At that

17   point in time Mr. Hershey went into the back of the liquor

18   store and came out with a suitcase, laid it on the counter,

19   opened it up, and Mr. Bodomdistal told me it was full of cash

20   money.

21   Q    Has -- has Mr. Hershey -- was he actually arrested at

22   this particular location earlier this week?

23   A    He was.

24   Q    And is this the address that is on his driver's

25   license?

```
 1     A     It is.

 2     Q     And when did you learn that he was living there, what

 3     month of this year?

 4     A     Approximately April of this year I learned that

 5     Mr. Hershey was living at this property.

 6     Q     And who gave that information?

 7     A     Benjamin Fisher.

 8     Q     And how did he know that?

 9     A     Benjamin Fisher was living with Mr. Hershey at the

10     time.

11     Q     At this address?

12     A     At this address.

13     Q     Okay.  According to your last review of the utilities

14     in the town of Gilcrest in May of 2014, who was listed on the

15     utilities billed for this particular property?

16     A     Benjamin Fisher/CBRI, Inc.

17     Q     Is Benjamin Fisher actually associated with CBRI, Inc.?

18     A     No, he is not.

19     Q     And what was the mailing address for Benjamin Fisher?

20     A     It was listed as a P.O. Box, P.O. Box 632 in Johnstown,

21     Colorado.

22     Q     And what do you know about that box?

23     A     I had the post office check the application for that

24     P.O. Box and they told me it was registered to Renee Molinar

25     and Johnstown Liquor at 21 South Parish in Johnstown,
```

1    Colorado.

2    Q    Directing your attention now, please, to Exhibit 3,

3    does this relate to 4403 Quartz Lane, Johnstown, Colorado?

4    A    It does.

5    Q    Is that another one of the properties that you

6    described which was purchased cash during the period of the

7    conspiracy?

8    A    That's correct.

9    Q    And what -- at the bottom of this particular chart you

10   have previous deposits to the Gilcrest Liquor, Inc. account.

11   Who was the listed owner of the Gilcrest Liquor, Inc. account

12   at that time?

13   A    Charles Reichert.

14   Q    And who was the listed owner of the Gilcrest Liquor

15   store at that time?

16   A    Charles Reichert.

17   Q    And what did Charles Reichert -- had someone else

18   purchased it prior to that and then transferred it to Charles

19   Reichert?

20   A    Yes.  Tina Stinint had initially -- was the owner of

21   the business.  She didn't get along with Mr. Hershey and the

22   business was then transferred to Charles Reichert.

23   Q    Was she one of those nominees that you named earlier?

24   A    She was.

25   Q    This particular exhibit shows third-party checks.  Did

1    John -- who was -- according -- according to the witnesses

2    who was actually operating Johnstown Liquor at that time?

3    A    Mr. Hershey.

4    Q    Did Johnstown Liquor, Gilcrest Liquor, as well as

5    Liquor Plus run check cashing businesses during this period?

6    A    They did.

7    Q    And particularly during the period when Mr. Hershey was

8    involved with the latter two?

9    A    That's correct.

10   Q    Did they as part of that business cash checks for

11   customers, for example, payroll checks?

12   A    They did.

13   Q    Did the businesses, therefore, have a certain need to

14   have a certain amount of cash on hand to cash those checks?

15   A    Yes, they did.

16   Q    And have you examined in detail the bank records which

17   show those checks at some point being deposited?

18   A    I have.

19   Q    And have you compared that to not only the point of

20   sale records that you received in 2013 from Mr. Reichert, but

21   also the QuickBooks and the bank records to determine how the

22   amount of cash compared -- was needed for cashing those

23   checks to the amount of cash that was being skimmed off at

24   the end of the day by Mr. Reichert and Miss Molinar?

25   A    I have.

1    Q     And what did you conclude?

2    A     I concluded that the cash that was skimmed off was

3    substantially greater than the cash that they would have

4    needed to cash checks.

5    Q     Now, in this particular example, Exhibit 3, how were

6    they using these third-party checks, the deposits of these

7    third-party checks?  What did they use those for in this

8    instance?

9    A     The third-party checks in this instance were used to

10   generate enough funds in this account in order to purchase

11   the money order to buy the property.  Instead of depositing

12   cash in this account they instead deposited third-party

13   checks to generate the funds they needed to purchase the

14   property.

15   Q     And did that have a tax consequence?

16   A     No.

17   Q     Perhaps I should say it this way.  Is the deposit of a

18   third-party check evidence of income?

19   A     No, it is not.

20   Q     Would deposit of cash be evidence of income?

21   A     Yes.

22   Q     Was this property then purchased by Charles Reichert in

23   this fashion?

24   A     It was.

25   Q     And what did Charles Reichert say -- who did -- who did

```
 1    Charles Reichert say directed him to do this?

 2    A    Mr. Hershey.

 3    Q    Were these three properties that we've just described

 4    those being Ruddy, 12th Street, and Quartz, did Mr. Reichert

 5    at some point then transfer them?

 6    A    He did.  In approximately January of 2012 Mr. Reichert

 7    quitclaimed all of these three properties to Mr. Hershey for

 8    no money.  It was just -- he quitclaimed them, didn't receive

 9    anything in exchange for them.

10    Q    And when was Miss Molinar and Mr. Reichert, when were

11    they first questioned by criminal investigators in connection

12    with this case?  Was it before or after that transfer?

13    A    Prior to this transfer.  It was in July of 2011.

14    Q    So this was several months after that?

15    A    That's correct, approximately six months.

16    Q    At that point had Mr. Reichert quit working for

17    Mr. Hershey?

18    A    Yes.  Mr. Reichert stopped working at Johnstown Liquor

19    in approximately September of 2011.

20    Q    These three properties then were held in Mr. Hershey's

21    name; is that correct?

22    A    They were.

23    Q    And what did he do with them as well as four other

24    properties that still remained in Renee Molinar's name on

25    March 22nd of 2012?
```

1   A     These properties, along with the four other you

2   mentioned, were sold to Mr. Hershey's uncle, Robert Hershey,

3   for approximately $1,000,000.

4   Q     Have you interviewed Mr. Robert Hershey?

5   A     I have.

6   Q     And what did he tell you that he was told as the reason

7   that Mr. Timothy Hershey had to sell those properties?

8   A     Mr. Robert Hershey told me that Mr. Hershey had a tax

9   problem and needed to generate some cash to pay the IRS.

10  Q     Was that in -- the sale of these were in March of 2012?

11  A     That's correct.

12  Q     And has Mr. Hershey paid any taxes whatsoever since

13  then --

14  A     No.

15  Q     -- or -- or at any time in your investigation?

16  A     No, he has not.

17  Q     Did Mr. Timothy Hershey, Alan Timothy Hershey, receive

18  a check at the closing for the sale of these three

19  properties, Ruddy, 12th Street and Quartz?

20  A     He did.  He received a check for approximately $460,000

21  for his portion of the sale proceeds.

22  Q     And what was the first thing he did with that check?

23  A     A check was deposited into a Compass Bank account in

24  Mr. Hershey's name that he opened in April of 2012.

25  Q     And, in fact, was that account opened with this check?

1    A    It was.

2    Q    What have you noticed in your investigation in this

3    case about the frequency with which Mr. Hershey actually has

4    accounts in his own name?

5    A    This -- the Compass Bank account that I'm speaking

6    about now that was opened in April of 2012 is the only

7    account that I'm aware of that is in Mr. Hershey's name

8    during the entire period of the investigation.

9    Q    What -- what did Mr. Hershey request be done with the

10   funds that were thus -- thus deposited into the Compass Bank

11   account in April of 2012?

12   A    Mr. Hershey wired those funds to a precious metal

13   dealer called Atmix located in Oklahoma and those funds were

14   ultimately used to purchase gold, platinum, and silver bars

15   which were subsequently delivered to the Johnstown Liquor at

16   21 South Parish in Johnstown, Colorado.

17   Q    And was that delivery site apparently chosen by Alan

18   Hershey, the purchaser of the precious metals?

19   A    Yes.

20        MS. KAUFMAN:  Can I approach?

21        THE COURT:  You may.

22   Q    (BY MS. KAUFMAN) What is shown, sir, in Exhibit 5?

23   A    Exhibit 5 is an order summary report from Atmix and it

24   consists of listing the particular gold, silver, and platinum

25   bars that were delivered to Alan Hershey at 21 South Parish

1    in Johnstown, Colorado.

2    Q    What is located at 21 South Parish, Johnstown,

3    Colorado?

4    A    That is the location of the Johnstown Liquor.

5    Q    Okay.  That is the street address where that's located?

6    A    That is correct.

7    Q    And where it was located at this time?

8    A    Yes.

9    Q    And had Mr. Hershey sold that real estate to Renee

10   Molinar back in 1996?

11   A    Yes.

12   Q    And --

13   A    Well, Renee Molinar purchased the property from Hays

14   Market.

15   Q    Excuse me.  In 1996; is that correct?

16   A    That's correct.

17   Q    And had Mr. Hershey ever been the owner of that

18   property?

19   A    No.

20   Q    Before 2012 had Renee Molinar sold that property to

21   anyone?

22   A    She had.

23   Q    To whom?

24   A    It was sold to Robert Hershey, Mr. Hershey's uncle, in

25   March of 2012.

1    Q    So as of this date in April 2012 it was in Mr. Robert

2    Hershey's name?

3    A    That's correct.

4    Q    And was that during the period of time that Mr. Hershey

5    was -- purportedly had no role in the running of the

6    business?

7    A    That is also correct.

8    Q    You've indicated that on March 22nd, 2012 Mr. Hershey,

9    Rob -- excuse me, Timothy Hershey arranged for the sale of

10   seven properties to Robert Hershey; is that correct?

11   A    That is correct.

12   Q    Three of which we've discussed.  Were the other four --

13   did the other four include 21 South Parish as well as 320

14   Rivera, Johnstown, 913 Elm Street, Milliken, and 113 Canal

15   Street, Johnstown?

16   A    They did.

17   Q    And had Renee Molinar held those in her name?

18   A    Yes.  All those properties were in Renee Molinar's

19   name.

20   Q    Did she then receive a check -- excuse me.  Did she

21   have funds from that closing wired to her personal account?

22   A    They were wired to the Johnstown Liquor account, a wire

23   of approximately $550,000, and then subsequent to that wire

24   Ms. Molinar informed the bank that she wanted to withdraw

25   those funds in cash.  The bank had a special delivery of cash

1    to the bank because they don't normally carry that much money

2    in cash, and then Miss Molinar took the cash in a backpack,

3    approximately $550,000, and left the bank with the money.

4    Q    And was that in April of 2012?

5    A    It was.

6    Q    Now, you've described about a million dollars that was

7    netted from the sale of those seven properties in March of

8    2012.  Is that all of the cash that you've talked about being

9    skimmed off from the business Johnstown Liquor or -- or not?

10   A    No, it is not.  I mean, the million dollars in this

11   transaction is just the sale of the properties.  It does not

12   include the undeposited cash that we covered before which is

13   approximately $4 million or the sale proceeds for the

14   Gilcrest Liquor or the Liquor Plus and those proceeds are

15   approximately another million dollars in cash.

16   Q    What did you learn about what became of the proceeds of

17   the sale of both Gilcrest Liquor and Liquor Plus?

18   A    They were withdrawn in the form of cash and -- at

19   Mr. Hershey's direction and given to Mr. Hershey.

20   Q    The cash was given to Mr. Hershey?

21   A    It was.

22   Q    And who made those withdrawals at his request?

23   A    The nominees which include Charles Reichert, Doug

24   Stone.  Those are the names that come to mind right now.

25   Q    In November 2011 did Renee Molinar sell the Johnstown

1      Liquor liquor business to another individual?

2      A     She did.

3      Q     To?

4      A     The business was sold to Ben Fisher who was an employee

5      of the Johnstown Liquor and had previously worked for

6      Mr. Hershey in another business located in Bennett, Colorado.

7      Q     How old was Mr. Ben Fisher at that time?

8      A     Approximately 26, 27 years old.

9      Q     And what kind of work did he do at the liquor stores?

10     A     He was a stocker and worked the cash registers.

11     Q     What was the purchase price for which Miss Molinar sold

12     the Johnstown Liquor in 2011 to Mr. Fisher?

13     A     The purchase price was $250,000.  That included the

14     goodwill, the business, and the inventory with $20,000 of

15     that money being paid down by Mr. Fisher and a $230,000

16     seller financing.

17     Q     And has Mr. Fisher been paying back that seller

18     financing to Miss Molinar?

19     A     He has.

20     Q     And did you look to see how it was that Mr. Fisher came

21     to have $20,000 cash to put down?

22     A     I did analyze Mr. Fisher's personal account and there

23     are numerous deposits of his payroll checks from working at

24     the Johnstown Liquor and that's how he was able to save up

25     the money in order to purchase the business.

1    Q     What did notice about any other funds being deposited

2    into that account?

3    A     I did not notice any other deposits, and the

4    withdrawals from that account mainly consisted of paying

5    Mr. Fisher's student loan, approximately 90,000 -- $90 a

6    month.

7    Q     And was Mr. Fisher working full-time at Johnstown

8    Liquor at the time he was saving up the $20,000?

9    A     He was.

10   Q     When Mr. Fisher was asked how he was able to save

11   virtually all of his money for the down payment and yet buy

12   gas and groceries, how did he respond?

13   A     He told me he was living off of loans from Mr. Hershey

14   or from loans from his father.

15   Q     And that was in 2012?

16   A     That --

17   Q     Excuse me, '11.

18   A     -- he told me that in 2014.

19   Q     Okay.  But, I mean, the event was in 2011; is that

20   correct?

21   A     Yes.

22   Q     What happened approximately two weeks after Mr. Fisher

23   was questioned about whether or not he was acting as yet

24   another nominee for Timothy Hershey as the owner of Johnstown

25   Liquor?

1    A    After Mr. Fisher was questioned approximately two weeks

2    after that took place I learned that the Johnstown Liquor was

3    for sale by Mr. Fisher for approximately $1.7 million without

4    including the inventory which was another 400,000, and there

5    was also an option to purchase the real estate, but that's

6    how much the business was for sale for.

7    Q    So that was 1 -- about 1.7 million not including the

8    inventory?

9    A    Correct, not including the inventory.

10    Q    And was the $250,000 price that he had paid Renee

11    Molinar for it earlier, $20,000 down, did that include the

12    inventory?

13    A    It did.

14    Q    Was this 21 South Parish listed in the advertisement by

15    Mr. Fisher listed as offering an option to buy that property?

16    A    Yeah.  There was an option to purchase as well.

17    Q    And who was and is the owner of that real estate?

18    A    Robert Hershey, Mr. Hershey's uncle.

19    Q    And did you question Mr. Robert Hershey about his

20    knowledge of whether or not his property was listed with an

21    option to buy by Ben Fisher?

22    A    I did.  I asked Mr. Robert Hershey if he was aware that

23    Johnstown Liquor was for sale and there was an option to

24    purchase the real estate.  He told me he was not aware of

25    that and that he had no intentions of selling the property

1   where the liquor business was located.

2   Q     And is that property still for sale, the business?

3   A     The business is still for sale as of yesterday.

4   Q     One last question.  When Mr. Hershey ordered -- did he

5   order the gold, platinum, and silver in two different

6   shipments in April of 2012?

7   A     He did.

8   Q     And were both of those to be delivered to 21 South

9   Parish, the location of Johnstown Liquor?

10   A     They were.

11   Q     Did he give a telephone number as his telephone number

12   when he purchased those commodities?

13   A     Yes.

14   Q     And that -- I'm not suggesting you might remember the

15   number, but did you investigate to see whose number that

16   actually was?

17   A     I did.  I obtained records from Verizon about that

18   number and that number was registered to Charles Reichert at

19   the time that it was listed on the application or the order

20   summary reports from Atmix in April of 2012.

21   Q     And was that months -- many months after Mr. Reichert

22   had left the employ of Johnstown Liquor?

23   A     Yes, it was.

24   Q     Was that consistent with what you understand that

25   Mr. Hershey does as far as using other people's telephone

1    numbers?

2    A    Yes, it is.

3         MS. KAUFMAN:  Thank you.  I move for the admission

4    of the exhibits that I've offered.

5         THE COURT:  1, 2, 3, and 5.  Any objection,

6    Mr. Arvin?

7         MR. ARVIN:  No objection, Your Honor.

8         THE COURT:  I don't think you're involved in this,

9    Miss Cruser, but any objection?

10        MS. CRUSER:  No, Your Honor.

11        THE COURT:  1, 2, 3, and 5 are admitted.

12   Mr. Arvin?  Mr. Arvin?

13                    CROSS-EXAMINATION

14   BY MR. ARVIN:

15   Q    Good morning, Mr. Garvey.

16   A    Good morning.

17   Q    I will be brief with you this morning because I

18   probably couldn't go through in summary fashion what you've

19   done here over the -- over the last 30 minutes or so.  But I

20   would like to step back for just a moment because for

21   accountant types like me when someone says that well, you

22   know, there were $470,000 in bank deposits, yet from some

23   other source there were $4 million or -- or in excess of

24   $4 million and so, therefore, you know, the difference must

25   be a skim, isn't it true that we can also take cash which is

1    not deposited and pay legitimate business expenses including

2    the purchase of inventory, the payment of rent, and other

3    business expenses which -- with cash which we do not deposit?

4    A    You could.   In this instance Miss Molinar was

5    questioned about the payment of cash expenses and she said

6    all expenses were paid by check.

7    Q    For this -- this entire difference, this entire gap?

8    A    That's what she said.

9    Q    I see.  Okay.

10         MR. ARVIN:  No further questions, Your Honor,

11   Mr. Garvey.

12         THE COURT:  Thank you.  Miss Cruser, I -- as I

13   say, I don't think you have any fight in this, but any

14   questions?

15         MS. CRUSER:  No.

16         THE COURT:  All right.  Miss Kaufman, anything

17   more?

18         MS. KAUFMAN:  Just one last question related to

19   Mr. Arvin's question.

20                        REDIRECT EXAMINATION

21   BY MS. KAUFMAN:

22   Q    Was the purchase of liquor and beer by check the

23   standard practice?

24   A    It was.  I obtained numerous records in this

25   investigation mainly consisting of supplier invoices and

1     supplier -- liquor supplier documentation in order to

2     corroborate the expenses in this investigation and there were

3     only a few instances where the supplier said that they were

4     paid by cash and I allowed those expenses in this case when I

5     was computing the tax due and owing.

6              MS. KAUFMAN:  Thank you.

7              THE COURT:  Thank you, Special Agent.  You may

8     step down.

9              THE WITNESS:  Okay.

10             THE COURT:  Other evidence, Miss Kaufman?

11             MS. KAUFMAN:  No, Your Honor.  Thank you.

12             THE COURT:  Any evidence, Mr. Arvin?

13             MR. ARVIN:  No further evidence, Your Honor.

14             THE COURT:  Okay.  I'll hear argument then, Miss

15     Kaufman, on the issue of detention.

16             MS. KAUFMAN:  Well, our position is that this

17     defendant is a flight risk and he's pretty much set himself

18     up to be a flight risk for many years.  He is facing 10

19     counts of tax evasion, and the nature of that crime is

20     consistent with the evidence you've seen today obviously and

21     -- and also consistent with his intent to evade prosecution

22     under the law.  He has a long history of concealing his

23     involvement as shown here and he was the mastermind, if you

24     would, behind this long conspiracy.  He has access to large

25     amounts of cash and every once in awhile we were able to see

1    amounts that he took.  We weren't able to see a lot of it
2    obviously, but we have, as the Agent has testified, witnesses
3    that would see suitcases full or safes full of cash from time
4    to time.  He used that at least in one instance to buy, not
5    deposit to a bank and leave it there, but to buy precious
6    metals which obviously can be transferred into cash quite
7    easily.  Most of the cash was concealed.  He had limited use
8    of bank accounts.  He had little or no use of credit cards.
9    He uses phones listed to other people.  He has no ownership
10   of real property in Colorado or elsewhere that we're aware
11   of.  He's not married.  He has no children, no children in
12   schools, no job, no history of employment.  He hasn't played
13   his -- paid his taxes or even filed a return since 1984.
14   He's essentially operating under the radar.  He has no known
15   ownership of vehicles registered to him.  He's very careful
16   to use vehicles belonging to apparently his girlfriends.
17   This has been consistent, going on for a number of years.
18   Concealed his income, concealed his assets, concealed his
19   involvement, evade legal requirements, both reporting
20   requirements, tax requirements.  He's careful.  He's devious
21   in that he had a double set of books used.  All means of
22   avoiding detection.  He was smart in using the check cashing
23   business to conceal and cloud the amount of cash that was
24   really coming in and to avoid depositing large cash which
25   would obviously be seen quickly by the IRS.  But for the fact

1    that Charles Reichert gave us voluntarily a copy of the true

2    books, that being the point of sale, he would be in a better

3    position today, and he obviously didn't have anything to do

4    with that.  He's poised for flight and I ask that he be

5    detained.

6              THE COURT:  Thank you.  Mr. Arvin?

7              MR. ARVIN:  Thank you, Your Honor.  The government

8    has detailed numerous alleged white collar crime violations

9    this morning in the nature of tax violations, but, frankly,

10   Your Honor, the government's desire to detain Mr. Hershey is

11   all at once perplexing and its reasons do not -- do not add

12   up for me.

13             With regard to the specific issue of detention

14   rather than the gravamen of the crimes themselves with the

15   Court's permission I'd like to spend a minute or two and tell

16   the Court what I know about Tim Hershey.  Mr. Hershey has

17   been a client of mine for exactly three years this month and

18   throughout most of the investigative stage of this case we've

19   talked at length about the possible outcome.  Mr. Hershey has

20   known that he might be charged and has known about the result

21   that has now come to pass for a long time.  Notwithstanding

22   the education he has received from me in connection with how

23   these things work, and even in the face of the quite serious

24   federal charges appearing in the indictment in this case, Tim

25   has not seized on any of a number of opportunities to flee

 1    from justice and he will not flee now.  I have double-checked

 2    US Probation's bond report and have been able to verify that

 3    Tim has no prior criminal record, no prior criminal record.

 4    And while the current allegations against him are quite

 5    serious, they don't involve danger to life or limb of any

 6    other person and are not within that category of crimes

 7    calling for a presumption in favor of detention.  Clearly

 8    then, of course, he has no history of failure to appear Court

 9    proceedings.

10         Tim has no drug or alcohol problems.  I recognize

11    that the bond report details some rare instances of drug and

12    alcohol use, some of them stretching back 20 years, but I

13    think rare and -- and sparse in comparison to I'm sure what

14    the Court sees from time to time.

15         In contrast to what's been represented regarding

16    Tim's ties to Colorado, and specifically to Denver, I can

17    tell you that he does have ties to the Denver community.

18    While his father has now passed away, both his mother and his

19    uncle reside in the Denver metro area, and his uncle is a

20    longtime established businessman here in our fair city.  I

21    have Tim's valid US passport in my possession.  I'm ready to

22    turn it into the Clerk's office before leaving the building

23    today.

24         Your Honor, I need Tim at my side to prepare his

25    defense.  You've heard quite a lot of detail this morning

1    regarding lots of financial transactions.  In a case such as

2    this with enormous document intensive features it becomes

3    quite difficult to transport thousands of such documents to

4    the Federal Detention Center and to review these on the

5    12-inch personal computer screen furnished in the regular

6    visitor rooms for this purpose.  In fact, Miss Kaufman has

7    graciously provided to Miss Cruser and myself this morning

8    her first round of discovery which itself contains 45,000

9    pages, and that seems to me to be quite a lot and I

10   understand that there are 13 boxes to go.  I would also note

11   that during the -- during all of the -- the -- the testimony

12   of Mr. Garvey and -- and the questions of Miss -- Mrs.

13   Kaufman, I -- I hear nothing about, you know, Tim Hershey

14   taking cash and secreting that across the international

15   border or any of that kind of thing.  He seems to stay put in

16   Weld County, Colorado just as he has done for the last three

17   years.  And I would -- I would like to see him frequently and

18   regularly outside of the boundaries of the Federal Detention

19   Center.  I, therefore, respectfully ask the Court to release

20   Tim Hershey today and to impose the least restrictive set of

21   conditions on his release as possible, Your Honor.

22         THE COURT:  So Miss Kaufman paints a picture

23   unrefuted of a man with substantial assets and a very small

24   footprint so it does worry me.  What do you -- if you were in

25   my chair what do you think those least restrictive means to

1    assure his appearance might be?

2              MR. ARVIN:  Well, naturally, Your Honor --

3              THE COURT:  I put you in my chair, not yours.

4              MR. ARVIN:  Right.  Right, Your Honor.  In my

5    chair I would lobby for an unsecured appearance bond in the

6    amount of $10,000 is what I would do, but, Your Honor, in

7    your chair I -- I think that I certainly would decide in --

8    in favor of -- of releasing Mr. Hershey today given

9    everything that I've heard.  I might consider releasing him

10   to the -- perhaps home detention with home arrest with

11   monitoring and possibly -- well, let me stop right there.  Is

12   that something that's attractive to the Court?

13             THE COURT:  It did cross my mind.

14             MR. ARVIN:  Okay.

15             THE COURT:  Thank you.

16             MR. ARVIN:  If I had to continue, Your Honor, I

17   might place him within the supervision of a suitable adult,

18   but he doesn't appear to be one who runs.  So that seems to

19   me to be a condition for those who like to run and disappear

20   and I don't think there's been any evidence here that --

21   that, you know, Mr. Hershey engages in that type of behavior.

22             THE COURT:  Thank you.  Miss Kaufman, it's rare to

23   detain a nonviolent white collar suspect with no criminal

24   record who has lived in the state for a number of years,

25   albeit largely under the radar.  What about home detention

1    and monitoring?

2           MS. KAUFMAN:  I guess first I'd like to respond to

3    the fact that he hasn't run.  He hasn't had any need to run

4    until now or once he's convicted so that isn't unusual.

5           THE COURT:  Well, what about -- I mean, I hear

6    that argument a lot since -- sometimes -- it's -- it's kind

7    of convincing.  You have had an ongoing investigation that

8    he's known about.  He's had a lawyer.  The lawyer no doubt

9    has talked to him and said whatever he said, but maybe

10   there's a lot of risk here and it looks to me like you might

11   do some time.  I don't know if he said that, just guessing

12   maybe he has, or at least that that's a possibility.  That's

13   exactly when a smart guy like this defendant would run, isn't

14   it?

15          MS. KAUFMAN:  I can just mention two cases I've

16   had recently.  One is Mascerenus (phonetics).  He waited

17   until after he had pled guilty prior to sentencing before

18   running.  And same with the two Weingarts (phonetics), white

19   collar cases, no criminal history, same thing.  They can go

20   for the whole length, drag out the process of being charged,

21   Court appearances, hearings, so on and so forth, lay the

22   foundation, they come to Court every time.  And I've had

23   three -- those three defendants, the first to come to my

24   mind, that have recently split at the last minute.  He has

25   had no reason to believe that because so much time has passed

1    that -- that an arrest was imminent or that he would be

2    detained.  All I'm saying is most people we can see how much

3    money they have whereas he has hidden it and is able to take

4    off at any time.  And he's refused to even talk about how he

5    lives, how he earns money.  Just not so sure how -- how much

6    I would -- I don't trust him at all, frankly.  But in answer

7    to the Court's question, clearly passport before release

8    surrender, ankle bracelet, strict supervision, disclosure of

9    all assets, including cash, precious metals, any other things

10   that he might have, a disclosure of all funds received and to

11   be received, provide verification of funds received, no

12   contact with witnesses, no travel.  And I wouldn't -- I would

13   request a $2 million cash bond because, frankly, I think he

14   has it and that's what's going to make an effect on this guy.

15   Thank you.

16            THE COURT:  Thank you.  I think the defendant is a

17   risk of flight and so I am going to order him detained

18   pending further proceedings.  I was interested in the

19   suggestion that he has not fled yet so why will he flee now,

20   but that doesn't answer the question.  He is now charged with

21   numerous serious crimes which carry with them if conviction

22   follows substantial prison time.  Ms. Kaufman has painted a

23   picture unrebutted of a person who is, in fact, as she says

24   poised for flight being completely under the radar for a

25   number of years and with access to substantial assumes of

1    money.  So he has no employment.  He has limited ties to the

2    community.  He has been under the radar.  He has on the

3    evidence before me concealed his involvement and in matters

4    -- in -- in business matters and his assets, all of that

5    shows a sneakiness which someone might engage in if they were

6    going to flee.  So I will order the defendant detained

7    pending further proceedings.

8         That brings us to the discovery memoranda.  I have

9    them.  With respect to Mr. Hershey, the speedy trial dates

10   are as follows:  30 days is August 13th, 2014, 70 days is

11   September 23rd, 2014, and 90 days is October 13th, 2014.  The

12   government will make its disclosures -- I guess I heard

13   you've done that today?

14        MS. KAUFMAN:  Actually, Your Honor, I can tell

15   you.  I've done several things.  I've given them the first

16   disk of materials that were scanned so that they all have

17   Bates numbers or in an organized fashion.  We're still in the

18   process of scanning and it will take I'd say two or two and a

19   half more weeks to complete that.  I've also filed a motion

20   for the Court to allow me to disclose grand jury transcripts

21   and grand jury exhibits.  Those will be ready to be FedExed

22   to them tomorrow as soon as I get the Court's order on that

23   from Judge Arguello.  I also have begun the process of

24   copying all of the witness interviews which can be sent out

25   also by FedEx tomorrow so that they'll have those right away.

1          I've also stated to counsel that even though the materials,

2     that is the bank records and those sorts of things, that will

3     be all scanned for them.  They are also available starting

4     tomorrow in our office for inspection and copying if they

5     wish to have them copied, but I think it's to everybody's

6     benefit to have them computerized and with numbers.  So I

7     would ask an additional -- let's say until August 1st to

8     disclose by Bates the Bates documents, additional disks.

9     But, again, they're available for them to inspect in our

10    office in the meantime.

11          THE COURT:  So on the form I should put down

12    August 1st?

13          MS. KAUFMAN:  That would be good.  Thank you.

14          THE COURT:  All right.  And what dates should I

15    indicate for reciprocal discovery, Mr. Arvin?

16          MR. ARVIN:  Your Honor, I'm sorry.  I do not have

17    a calendar in front of me.  The 14th day after the end of the

18    Labor Day weekend.

19          THE COURT:  That would be September 15 I suppose.

20    What do you think about that?

21          MS. KAUFMAN:  Well, as -- until -- until and

22    unless there's a motion to continue that's the (inaudible)

23    before trial.

24          THE COURT:  Beyond the speedy trial date, yes.

25          MS. KAUFMAN:  So I think that, you know, we can

1    (inaudible) on the date if possible, but I understand that

2    they'll likely file a motion (inaudible).

3         THE COURT:  Well, let me put down August 22nd and,

4    of course, if you file -- if anyone files a motion about

5    complexity or the like that will no doubt change.  So

6    August 22nd for reciprocal discovery.

7         With respect to Miss Molinar the speedy trial

8    dates are the same except the 90 days doesn't apply since

9    she's not in custody.  So 30 days is August 13, 2014 and

10   70 days is September 23rd, 2014.  And I'll put down

11   August 1st again for the government's disclosures and the

12   22nd, Miss Cruser, for your reciprocal discovery?

13        MS. CRUSER:  That will be fine, Your Honor.  And I

14   will be filing a motion for complexity.

15        THE COURT:  Please see Judge Arguello's chambers

16   for all remaining pretrial and trial dates.  Anything more

17   this morning, Miss Kaufman?

18        MS. KAUFMAN:  No, Your Honor.

19        THE COURT:  Mr. Arvin?

20        MR. ARVIN:  Nothing further, Your Honor.  Thank

21   you.

22        THE COURT:  Miss Cruser?

23        MS. CRUSER:  Nothing further.

24        THE COURT:  Thank you.  Mr. Hershey is remanded to

25   the custody of the United States Marshal pending further

1    proceedings and Miss Molinar is continued on her bond.  Thank

2    you very much.

3              THE CLERK:  All rise.

4

5              (Whereupon, the within hearing was then in

6    conclusion at 11:16 a.m.)

7

8              I certify that the foregoing is a correct

9    transcript, to the best of my knowledge and belief (pursuant

10   to the quality of the recording) from the record of

11   proceedings in the above-entitled matter.

12

13

14      /s/ Laurel Tubbs                July 29, 2014

15   Signature of Transcriber                  Date

16

17

18

19

20

21

22

23

24

25

<pre>
1                        I N D E X

2                                                   PAGE

3      MIKE GARVEY

4      Direct Examination by Ms. Kaufman            4
       Cross-Examination by Mr. Arvin               33
5      Redirect Examination by Ms. Kaufman          34

6

7

8

9

10

11

12                        E X H I B I T S

13
                                        OFFERED      ADMITTED
14
       Government Exhibit No. 1            33           33
15     Government Exhibit No. 2            33           33
       Government Exhibit No. 3            33           33
16     Government Exhibit No. 5            33           33

17

18

19

20

21

22

23

24

25
</pre>

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305