1    A    These properties, along with the four other you

2    mentioned, were sold to Mr. Hershey's uncle, Robert Hershey,

3    for approximately $1,000,000.

4    Q    Have you interviewed Mr. Robert Hershey?

5    A    I have.

6    Q    And what did he tell you that he was told as the reason

7    that Mr. Timothy Hershey had to sell those properties?

8    A    Mr. Robert Hershey told me that Mr. Hershey had a tax

9    problem and needed to generate some cash to pay the IRS.

10   Q    Was that in -- the sale of these were in March of 2012?

11   A    That's correct.

12   Q    And has Mr. Hershey paid any taxes whatsoever since

13   then --

14   A    No.

15   Q    -- or -- or at any time in your investigation?

16   A    No, he has not.

17   Q    Did Mr. Timothy Hershey, Alan Timothy Hershey, receive

18   a check at the closing for the sale of these three

19   properties, Ruddy, 12th Street and Quartz?

20   A    He did.  He received a check for approximately $460,000

21   for his portion of the sale proceeds.

22   Q    And what was the first thing he did with that check?

23   A    A check was deposited into a Compass Bank account in

24   Mr. Hershey's name that he opened in April of 2012.

25   Q    And, in fact, was that account opened with this check?

**U.S. v. HERSHEY: 14-cr-281-CMA-BNB**          **DEFENSE EXHIBIT 1     Page 24 of 47**

25

1    A    It was.

2    Q    What have you noticed in your investigation in this

3    case about the frequency with which Mr. Hershey actually has

4    accounts in his own name?

5    A    This -- the Compass Bank account that I'm speaking

6    about now that was opened in April of 2012 is the only

7    account that I'm aware of that is in Mr. Hershey's name

8    during the entire period of the investigation.

9    Q    What -- what did Mr. Hershey request be done with the

10   funds that were thus -- thus deposited into the Compass Bank

11   account in April of 2012?

12   A    Mr. Hershey wired those funds to a precious metal

13   dealer called Atmix located in Oklahoma and those funds were

14   ultimately used to purchase gold, platinum, and silver bars

15   which were subsequently delivered to the Johnstown Liquor at

16   21 South Parish in Johnstown, Colorado.

17   Q    And was that delivery site apparently chosen by Alan

18   Hershey, the purchaser of the precious metals?

19   A    Yes.

20         MS. KAUFMAN:  Can I approach?

21         THE COURT:  You may.

22   Q    (BY MS. KAUFMAN) What is shown, sir, in Exhibit 5?

23   A    Exhibit 5 is an order summary report from Atmix and it

24   consists of listing the particular gold, silver, and platinum

25   bars that were delivered to Alan Hershey at 21 South Parish

**DEFENSE
EXHIBIT 2**

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305

1      in Johnstown, Colorado.

2      Q      What is located at 21 South Parish, Johnstown,

3      Colorado?

4      A      That is the location of the Johnstown Liquor.

5      Q      Okay.  That is the street address where that's located?

6      A      That is correct.

7      Q      And where it was located at this time?

8      A      Yes.

9      Q      And had Mr. Hershey sold that real estate to Renee

10     Molinar back in 1996?

11     A      Yes.

12     Q      And --

13     A      Well, Renee Molinar purchased the property from Hays

14     Market.

15     Q      Excuse me.  In 1996; is that correct?

16     A      That's correct.

17     Q      And had Mr. Hershey ever been the owner of that

18     property?

19     A      No.

20     Q      Before 2012 had Renee Molinar sold that property to

21     anyone?

22     A      She had.

23     Q      To whom?

24     A      It was sold to Robert Hershey, Mr. Hershey's uncle, in

25     March of 2012.

1    Q    So as of this date in April 2012 it was in Mr. Robert

2    Hershey's name?

3    A    That's correct.

4    Q    And was that during the period of time that Mr. Hershey

5    was -- purportedly had no role in the running of the

6    business?

7    A    That is also correct.

8    Q    You've indicated that on March 22nd, 2012 Mr. Hershey,

9    Rob -- excuse me, Timothy Hershey arranged for the sale of

10   seven properties to Robert Hershey; is that correct?

11   A    That is correct.

12   Q    Three of which we've discussed.  Were the other four --

13   did the other four include 21 South Parish as well as 320

14   Rivera, Johnstown, 913 Elm Street, Milliken, and 113 Canal

15   Street, Johnstown?

16   A    They did.

17   Q    And had Renee Molinar held those in her name?

18   A    Yes.  All those properties were in Renee Molinar's

19   name.

20   Q    Did she then receive a check -- excuse me.  Did she

21   have funds from that closing wired to her personal account?

22   A    They were wired to the Johnstown Liquor account, a wire

23   of approximately $550,000, and then subsequent to that wire

24   Ms. Molinar informed the bank that she wanted to withdraw

25   those funds in cash.  The bank had a special delivery of cash

1    to the bank because they don't normally carry that much money

2    in cash, and then Miss Molinar took the cash in a backpack,

3    approximately $550,000, and left the bank with the money.

4    Q    And was that in April of 2012?

5    A    It was.

6    Q    Now, you've described about a million dollars that was

7    netted from the sale of those seven properties in March of

8    2012.  Is that all of the cash that you've talked about being

9    skimmed off from the business Johnstown Liquor or -- or not?

10   A    No, it is not.  I mean, the million dollars in this

11   transaction is just the sale of the properties.  It does not

12   include the undeposited cash that we covered before which is

13   approximately $4 million or the sale proceeds for the

14   Gilcrest Liquor or the Liquor Plus and those proceeds are

15   approximately another million dollars in cash.

16   Q    What did you learn about what became of the proceeds of

17   the sale of both Gilcrest Liquor and Liquor Plus?

18   A    They were withdrawn in the form of cash and -- at

19   Mr. Hershey's direction and given to Mr. Hershey.

20   Q    The cash was given to Mr. Hershey?

21   A    It was.

22   Q    And who made those withdrawals at his request?

23   A    The nominees which include Charles Reichert, Doug

24   Stone.  Those are the names that come to mind right now.

25   Q    In November 2011 did Renee Molinar sell the Johnstown

1    Liquor liquor business to another individual?

2    A    She did.

3    Q    To?

4    A    The business was sold to Ben Fisher who was an employee

5    of the Johnstown Liquor and had previously worked for

6    Mr. Hershey in another business located in Bennett, Colorado.

7    Q    How old was Mr. Ben Fisher at that time?

8    A    Approximately 26, 27 years old.

9    Q    And what kind of work did he do at the liquor stores?

10   A    He was a stocker and worked the cash registers.

11   Q    What was the purchase price for which Miss Molinar sold

12   the Johnstown Liquor in 2011 to Mr. Fisher?

13   A    The purchase price was $250,000.  That included the

14   goodwill, the business, and the inventory with $20,000 of

15   that money being paid down by Mr. Fisher and a $230,000

16   seller financing.

17   Q    And has Mr. Fisher been paying back that seller

18   financing to Miss Molinar?

19   A    He has.

20   Q    And did you look to see how it was that Mr. Fisher came

21   to have $20,000 cash to put down?

22   A    I did analyze Mr. Fisher's personal account and there

23   are numerous deposits of his payroll checks from working at

24   the Johnstown Liquor and that's how he was able to save up

25   the money in order to purchase the business.

30

1    Q    What did notice about any other funds being deposited

2    into that account?

3    A    I did not notice any other deposits, and the

4    withdrawals from that account mainly consisted of paying

5    Mr. Fisher's student loan, approximately 90,000 -- $90 a

6    month.

7    Q    And was Mr. Fisher working full-time at Johnstown

8    Liquor at the time he was saving up the $20,000?

9    A    He was.

10   Q    When Mr. Fisher was asked how he was able to save

11   virtually all of his money for the down payment and yet buy

12   gas and groceries, how did he respond?

13   A    He told me he was living off of loans from Mr. Hershey

14   or from loans from his father.

15   Q    And that was in 2012?

16   A    That --

17   Q    Excuse me, '11.

18   A    -- he told me that in 2014.

19   Q    Okay.  But, I mean, the event was in 2011; is that

20   correct?

21   A    Yes.

22   Q    What happened approximately two weeks after Mr. Fisher

23   was questioned about whether or not he was acting as yet

24   another nominee for Timothy Hershey as the owner of Johnstown

25   Liquor?

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305

1    A    After Mr. Fisher was questioned approximately two weeks

2    after that took place I learned that the Johnstown Liquor was

3    for sale by Mr. Fisher for approximately $1.7 million without

4    including the inventory which was another 400,000, and there

5    was also an option to purchase the real estate, but that's

6    how much the business was for sale for.

7    Q    So that was 1 -- about 1.7 million not including the

8    inventory?

9    A    Correct, not including the inventory.

10   Q    And was the $250,000 price that he had paid Renee

11   Molinar for it earlier, $20,000 down, did that include the

12   inventory?

13   A    It did.

14   Q    Was this 21 South Parish listed in the advertisement by

15   Mr. Fisher listed as offering an option to buy that property?

16   A    Yeah.  There was an option to purchase as well.

17   Q    And who was and is the owner of that real estate?

18   A    Robert Hershey, Mr. Hershey's uncle.

19   Q    And did you question Mr. Robert Hershey about his

20   knowledge of whether or not his property was listed with an

21   option to buy by Ben Fisher?

22   A    I did.  I asked Mr. Robert Hershey if he was aware that

23   Johnstown Liquor was for sale and there was an option to

24   purchase the real estate.  He told me he was not aware of

25   that and that he had no intentions of selling the property

1    where the liquor business was located.

2    Q    And is that property still for sale, the business?

3    A    The business is still for sale as of yesterday.

4    Q    One last question.  When Mr. Hershey ordered -- did he

5    order the gold, platinum, and silver in two different

6    shipments in April of 2012?

7    A    He did.

8    Q    And were both of those to be delivered to 21 South

9    Parish, the location of Johnstown Liquor?

10    A    They were.

11    Q    Did he give a telephone number as his telephone number

12    when he purchased those commodities?

13    A    Yes.

14    Q    And that -- I'm not suggesting you might remember the

15    number, but did you investigate to see whose number that

16    actually was?

17    A    I did.  I obtained records from Verizon about that

18    number and that number was registered to Charles Reichert at

19    the time that it was listed on the application or the order

20    summary reports from Atmix in April of 2012.

21    Q    And was that months -- many months after Mr. Reichert

22    had left the employ of Johnstown Liquor?

23    A    Yes, it was.

24    Q    Was that consistent with what you understand that

25    Mr. Hershey does as far as using other people's telephone

33

1    numbers?

2    A     Yes, it is.

3          MS. KAUFMAN:  Thank you.  I move for the admission

4    of the exhibits that I've offered.

5          THE COURT:  1, 2, 3, and 5.  Any objection,

6    Mr. Arvin?

7          MR. ARVIN:  No objection, Your Honor.

8          THE COURT:  I don't think you're involved in this,

9    Miss Cruser, but any objection?

10         MS. CRUSER:  No, Your Honor.

11         THE COURT:  1, 2, 3, and 5 are admitted.

12   Mr. Arvin?  Mr. Arvin?

13                   CROSS-EXAMINATION

14   BY MR. ARVIN:

15   Q    Good morning, Mr. Garvey.

16   A    Good morning.

17   Q    I will be brief with you this morning because I

18   probably couldn't go through in summary fashion what you've

19   done here over the -- over the last 30 minutes or so.  But I

20   would like to step back for just a moment because for

21   accountant types like me when someone says that well, you

22   know, there were $470,000 in bank deposits, yet from some

23   other source there were $4 million or -- or in excess of

24   $4 million and so, therefore, you know, the difference must

25   be a skim, isn't it true that we can also take cash which is

1    not deposited and pay legitimate business expenses including

2    the purchase of inventory, the payment of rent, and other

3    business expenses which -- with cash which we do not deposit?

4    A     You could.  In this instance Miss Molinar was

5    questioned about the payment of cash expenses and she said

6    all expenses were paid by check.

7    Q     For this -- this entire difference, this entire gap?

8    A     That's what she said.

9    Q     I see.  Okay.

10          MR. ARVIN:  No further questions, Your Honor,

11   Mr. Garvey.

12          THE COURT:  Thank you.  Miss Cruser, I -- as I

13   say, I don't think you have any fight in this, but any

14   questions?

15          MS. CRUSER:  No.

16          THE COURT:  All right.  Miss Kaufman, anything

17   more?

18          MS. KAUFMAN:  Just one last question related to

19   Mr. Arvin's question.

20                    REDIRECT EXAMINATION

21   BY MS. KAUFMAN:

22   Q     Was the purchase of liquor and beer by check the

23   standard practice?

24   A     It was.  I obtained numerous records in this

25   investigation mainly consisting of supplier invoices and

1    supplier -- liquor supplier documentation in order to

2    corroborate the expenses in this investigation and there were

3    only a few instances where the supplier said that they were

4    paid by cash and I allowed those expenses in this case when I

5    was computing the tax due and owing.

6              MS. KAUFMAN:  Thank you.

7              THE COURT:  Thank you, Special Agent.  You may

8    step down.

9              THE WITNESS:  Okay.

10             THE COURT:  Other evidence, Miss Kaufman?

11             MS. KAUFMAN:  No, Your Honor.  Thank you.

12             THE COURT:  Any evidence, Mr. Arvin?

13             MR. ARVIN:  No further evidence, Your Honor.

14             THE COURT:  Okay.  I'll hear argument then, Miss

15   Kaufman, on the issue of detention.

16             MS. KAUFMAN:  Well, our position is that this

17   defendant is a flight risk and he's pretty much set himself

18   up to be a flight risk for many years.  He is facing 10

19   counts of tax evasion, and the nature of that crime is

20   consistent with the evidence you've seen today obviously and

21   -- and also consistent with his intent to evade prosecution

22   under the law.  He has a long history of concealing his

23   involvement as shown here and he was the mastermind, if you

24   would, behind this long conspiracy.  He has access to large

25   amounts of cash and every once in awhile we were able to see

1     amounts that he took.  We weren't able to see a lot of it
2     obviously, but we have, as the Agent has testified, witnesses
3     that would see suitcases full or safes full of cash from time
4     to time.  He used that at least in one instance to buy, not
5     deposit to a bank and leave it there, but to buy precious
6     metals which obviously can be transferred into cash quite
7     easily.  Most of the cash was concealed.  He had limited use
8     of bank accounts.  He had little or no use of credit cards.
9     He uses phones listed to other people.  He has no ownership
10    of real property in Colorado or elsewhere that we're aware
11    of.  He's not married.  He has no children, no children in
12    schools, no job, no history of employment.  He hasn't played
13    his -- paid his taxes or even filed a return since 1984.
14    He's essentially operating under the radar.  He has no known
15    ownership of vehicles registered to him.  He's very careful
16    to use vehicles belonging to apparently his girlfriends.
17    This has been consistent, going on for a number of years.
18    Concealed his income, concealed his assets, concealed his
19    involvement, evade legal requirements, both reporting
20    requirements, tax requirements.  He's careful.  He's devious
21    in that he had a double set of books used.  All means of
22    avoiding detection.  He was smart in using the check cashing
23    business to conceal and cloud the amount of cash that was
24    really coming in and to avoid depositing large cash which
25    would obviously be seen quickly by the IRS.  But for the fact

1   that Charles Reichert gave us voluntarily a copy of the true

2   books, that being the point of sale, he would be in a better

3   position today, and he obviously didn't have anything to do

4   with that.  He's poised for flight and I ask that he be

5   detained.

6               THE COURT:  Thank you.  Mr. Arvin?

7               MR. ARVIN:  Thank you, Your Honor.  The government

8   has detailed numerous alleged white collar crime violations

9   this morning in the nature of tax violations, but, frankly,

10  Your Honor, the government's desire to detain Mr. Hershey is

11  all at once perplexing and its reasons do not -- do not add

12  up for me.

13              With regard to the specific issue of detention

14  rather than the gravamen of the crimes themselves with the

15  Court's permission I'd like to spend a minute or two and tell

16  the Court what I know about Tim Hershey.  Mr. Hershey has

17  been a client of mine for exactly three years this month and

18  throughout most of the investigative stage of this case we've

19  talked at length about the possible outcome.  Mr. Hershey has

20  known that he might be charged and has known about the result

21  that has now come to pass for a long time.  Notwithstanding

22  the education he has received from me in connection with how

23  these things work, and even in the face of the quite serious

24  federal charges appearing in the indictment in this case, Tim

25  has not seized on any of a number of opportunities to flee

1    from justice and he will not flee now.  I have double-checked

2    US Probation's bond report and have been able to verify that

3    Tim has no prior criminal record, no prior criminal record.

4    And while the current allegations against him are quite

5    serious, they don't involve danger to life or limb of any

6    other person and are not within that category of crimes

7    calling for a presumption in favor of detention.  Clearly

8    then, of course, he has no history of failure to appear Court

9    proceedings.

10         Tim has no drug or alcohol problems.  I recognize

11   that the bond report details some rare instances of drug and

12   alcohol use, some of them stretching back 20 years, but I

13   think rare and -- and sparse in comparison to I'm sure what

14   the Court sees from time to time.

15         In contrast to what's been represented regarding

16   Tim's ties to Colorado, and specifically to Denver, I can

17   tell you that he does have ties to the Denver community.

18   While his father has now passed away, both his mother and his

19   uncle reside in the Denver metro area, and his uncle is a

20   longtime established businessman here in our fair city.  I

21   have Tim's valid US passport in my possession.  I'm ready to

22   turn it into the Clerk's office before leaving the building

23   today.

24         Your Honor, I need Tim at my side to prepare his

25   defense.  You've heard quite a lot of detail this morning

1    regarding lots of financial transactions.  In a case such as

2    this with enormous document intensive features it becomes

3    quite difficult to transport thousands of such documents to

4    the Federal Detention Center and to review these on the

5    12-inch personal computer screen furnished in the regular

6    visitor rooms for this purpose.  In fact, Miss Kaufman has

7    graciously provided to Miss Cruser and myself this morning

8    her first round of discovery which itself contains 45,000

9    pages, and that seems to me to be quite a lot and I

10   understand that there are 13 boxes to go.  I would also note

11   that during the -- during all of the -- the -- the testimony

12   of Mr. Garvey and -- and the questions of Miss -- Mrs.

13   Kaufman, I -- I hear nothing about, you know, Tim Hershey

14   taking cash and secreting that across the international

15   border or any of that kind of thing.  He seems to stay put in

16   Weld County, Colorado just as he has done for the last three

17   years.  And I would -- I would like to see him frequently and

18   regularly outside of the boundaries of the Federal Detention

19   Center.  I, therefore, respectfully ask the Court to release

20   Tim Hershey today and to impose the least restrictive set of

21   conditions on his release as possible, Your Honor.

22        THE COURT:  So Miss Kaufman paints a picture

23   unrefuted of a man with substantial assets and a very small

24   footprint so it does worry me.  What do you -- if you were in

25   my chair what do you think those least restrictive means to

1 assure his appearance might be?

2    MR. ARVIN: Well, naturally, Your Honor --

3    THE COURT: 1 put you in my chair, not yours.

4    MR. ARVIN: Right. Right, Your Honor. In my

5 chair I would lobby for an unsecured appearance bond in the

6 amount of $10,000 is what I would do, but, Your Honor, in

7 your chair I -- I think that I certainly would decide in --

8 in favor of -- of releasing Mr. Hershey today given

9 everything that I've heard. I might consider releasing him

10 to the -- perhaps home detention with home arrest with

11 monitoring and possibly -- well, let me stop right there. Is

12 that something that's attractive to the Court?

13    THE COURT: It did cross my mind.

14    MR. ARVIN: Okay.

15    THE COURT: Thank you.

16    MR. ARVIN: If I had to continue, Your Honor, I

17 might place him within the supervision of a suitable adult,

18 but he doesn't appear to be one who runs. So that seems to

19 me to be a condition for those who like to run and disappear

20 and I don't think there's been any evidence here that --

21 that, you know, Mr. Hershey engages in that type of behavior.

22    THE COURT: Thank you. Miss Kaufman, it's rare to

23 detain a nonviolent white collar suspect with no criminal

24 record who has lived in the state for a number of years,

25 albeit largely under the radar. What about home detention

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119   FAX 303-893-8305

U.S. v. HERSHEY: 14-cr-281-CMA-BNB   DEFENSE EXHIBIT 1  Page 40 of 47

1    and monitoring?

2          MS. KAUFMAN:   I guess first I'd like to respond to

3    the fact that he hasn't run.   He hasn't had any need to run

4    until now or once he's convicted so that isn't unusual.

5          THE COURT:   Well, what about -- I mean, I hear

6    that argument a lot since -- sometimes -- it's -- it's kind

7    of convincing.   You have had an ongoing investigation that

8    he's known about.   He's had a lawyer.   The lawyer no doubt

9    has talked to him and said whatever he said, but maybe

10   there's a lot of risk here and it looks to me like you might

11   do some time.   I don't know if he said that, just guessing

12   maybe he has, or at least that that's a possibility.   That's

13   exactly when a smart guy like this defendant would run, isn't

14   it?

15         MS. KAUFMAN:   I can just mention two cases I've

16   had recently.   One is Mascerenus (phonetics).   He waited

17   until after he had pled guilty prior to sentencing before

18   running.   And same with the two Weingarts (phonetics), white

19   collar cases, no criminal history, same thing.   They can go

20   for the whole length, drag out the process of being charged,

21   Court appearances, hearings, so on and so forth, lay the

22   foundation, they come to Court every time.   And I've had

23   three -- those three defendants, the first to come to my

24   mind, that have recently split at the last minute.   He has

25   had no reason to believe that because so much time has passed

1    that -- that an arrest was imminent or that he would be

2    detained.  All I'm saying is most people we can see how much

3    money they have whereas he has hidden it and is able to take

4    off at any time.  And he's refused to even talk about how he

5    lives, how he earns money.  Just not so sure how -- how much

6    I would -- I don't trust him at all, frankly.  But in answer

7    to the Court's question, clearly passport before release

8    surrender, ankle bracelet, strict supervision, disclosure of

9    all assets, including cash, precious metals, any other things

10   that he might have, a disclosure of all funds received and to

11   be received, provide verification of funds received, no

12   contact with witnesses, no travel.  And I wouldn't -- I would

13   request a $2 million cash bond because, frankly, I think he

14   has it and that's what's going to make an effect on this guy.

15   Thank you.

16            THE COURT:  Thank you.  I think the defendant is a

17   risk of flight and so I am going to order him detained

18   pending further proceedings.  I was interested in the

19   suggestion that he has not fled yet so why will he flee now,

20   but that doesn't answer the question.  He is now charged with

21   numerous serious crimes which carry with them if conviction

22   follows substantial prison time.  Ms. Kaufman has painted a

23   picture unrebutted of a person who is, in fact, as she says

24   poised for flight being completely under the radar for a

25   number of years and with access to substantial assumes of

43

1    money.  So he has no employment.  He has limited ties to the
2    community.  He has been under the radar.  He has on the
3    evidence before me concealed his involvement and in matters
4    -- in -- in business matters and his assets, all of that
5    shows a sneakiness which someone might engage in if they were
6    going to flee.  So I will order the defendant detained
7    pending further proceedings.
8              That brings us to the discovery memoranda.  I have
9    them.  With respect to Mr. Hershey, the speedy trial dates
10   are as follows:  30 days is August 13th, 2014, 70 days is
11   September 23rd, 2014, and 90 days is October 13th, 2014.  The
12   government will make its disclosures -- I guess I heard
13   you've done that today?
14             MS. KAUFMAN:  Actually, Your Honor, I can tell
15   you.  I've done several things.  I've given them the first
16   disk of materials that were scanned so that they all have
17   Bates numbers or in an organized fashion.  We're still in the
18   process of scanning and it will take I'd say two or two and a
19   half more weeks to complete that.  I've also filed a motion
20   for the Court to allow me to disclose grand jury transcripts
21   and grand jury exhibits.  Those will be ready to be FedExed
22   to them tomorrow as soon as I get the Court's order on that
23   from Judge Arguello.  I also have begun the process of
24   copying all of the witness interviews which can be sent out
25   also by FedEx tomorrow so that they'll have those right away.

1    I've also stated to counsel that even though the materials,

2    that is the bank records and those sorts of things, that will

3    be all scanned for them.  They are also available starting

4    tomorrow in our office for inspection and copying if they

5    wish to have them copied, but I think it's to everybody's

6    benefit to have them computerized and with numbers.  So I

7    would ask an additional -- let's say until August 1st to

8    disclose by Bates the Bates documents, additional disks.

9    But, again, they're available for them to inspect in our

10   office in the meantime.

11            THE COURT:  So on the form I should put down

12   August 1st?

13            MS. KAUFMAN:  That would be good.  Thank you.

14            THE COURT:  All right.  And what dates should I

15   indicate for reciprocal discovery, Mr. Arvin?

16            MR. ARVIN:  Your Honor, I'm sorry.  I do not have

17   a calendar in front of me.  The 14th day after the end of the

18   Labor Day weekend.

19            THE COURT:  That would be September 15 I suppose.

20   What do you think about that?

21            MS. KAUFMAN:  Well, as -- until -- until and

22   unless there's a motion to continue that's the (inaudible)

23   before trial.

24            THE COURT:  Beyond the speedy trial date, yes.

25            MS. KAUFMAN:  So I think that, you know, we can

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305

1    (inaudible) on the date if possible, but I understand that

2    they'll likely file a motion (inaudible).

3          THE COURT:  Well, let me put down August 22nd and,

4    of course, if you file -- if anyone files a motion about

5    complexity or the like that will no doubt change.  So

6    August 22nd for reciprocal discovery.

7          With respect to Miss Molinar the speedy trial

8    dates are the same except the 90 days doesn't apply since

9    she's not in custody.  So 30 days is August 13, 2014 and

10    70 days is September 23rd, 2014.  And I'll put down

11    August 1st again for the government's disclosures and the

12    22nd, Miss Cruser, for your reciprocal discovery?

13          MS. CRUSER:  That will be fine, Your Honor.  And I

14    will be filing a motion for complexity.

15          THE COURT:  Please see Judge Arguello's chambers

16    for all remaining pretrial and trial dates.  Anything more

17    this morning, Miss Kaufman?

18          MS. KAUFMAN:  No, Your Honor.

19          THE COURT:  Mr. Arvin?

20          MR. ARVIN:  Nothing further, Your Honor.  Thank

21    you.

22          THE COURT:  Miss Cruser?

23          MS. CRUSER:  Nothing further.

24          THE COURT:  Thank you.  Mr. Hershey is remanded to

25    the custody of the United States Marshal pending further

1    proceedings and Miss Molinar is continued on her bond.   Thank

2    you very much.

3              THE CLERK:   All rise.

4

5              (Whereupon, the within hearing was then in

6    conclusion at 11:16 a.m.)

7

8              I certify that the foregoing is a correct

9    transcript, to the best of my knowledge and belief (pursuant

10   to the quality of the recording) from the record of

11   proceedings in the above-entitled matter.

12

13

14       /s/ Laurel Tubbs              July 29, 2014

15   Signature of Transcriber              Date

16

17

18

19

20

21

22

23

24

25

47

```
 1                      I N D E X

 2                                                PAGE

 3      MIKE GARVEY

 4      Direct Examination by Ms. Kaufman             4
        Cross-Examination by Mr. Arvin              33
 5      Redirect Examination by Ms. Kaufman         34

 6

 7

 8

 9

10

11

12

13                    E X H I B I T S

14                                      OFFERED      ADMITTED

        Government Exhibit No. 1          33           33
15      Government Exhibit No. 2          33           33
        Government Exhibit No. 3          33           33
16      Government Exhibit No. 5          33           33

17

18

19

20

21

22

23

24

25
```

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305