1

1             IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3     Case No. 14-cr-00281-CMA

4     ─────────────────────────────────────────────────

5     UNITED STATES OF AMERICA,

6          Plaintiff,

7     vs.

8     ALAN TIMOTHY HERSHEY and RENEE MOLINAR,

9          Defendants.

10    ─────────────────────────────────────────────────

11             Proceedings before BOYD N. BOLAND, United States

12    Magistrate Judge, United States District Court for the

13    District of Colorado, commencing at 10:09 a.m., July 17,

14    2014, in the United States Courthouse, Denver, Colorado.

15    ─────────────────────────────────────────────────

16             WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18    ─────────────────────────────────────────────────

19                      APPEARANCES

20          LINDA KAUFMAN, Assistant United States Attorney,

21    appearing for the government.

22          MICHAEL ARVIN, Attorney at Law, appearing for the

23    defendant Alan Timothy Hershey.

24    ─────────────────────────────────────────────────

25                    MOTIONS HEARING

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305

```
 1                    APPEARANCES (Cont'd)
 2              AMANDA CRUSER, Attorney at Law, appearing for the
 3      defendant Renee Molinar.
 4                      P R O C E E D I N G S
 5              (Whereupon, the within electronically recorded
 6      proceedings are herein transcribed, pursuant to order of
 7      counsel.)
 8              (Whereupon, in several instances counsel were not
 9      speaking in a microphone and the text is inaudible.)
10              THE CLERK:  All rise.  Court is in session.
11              THE COURT:  Thank you.  Please be seated.  This is
12      case 14-cr-281, United States of America versus Alan Timothy
13      Hershey and Renee Molinar.  For the United States?
14              MS. KAUFMAN:  Good morning, Your Honor.  Linda
15      Kaufman on behalf of the United States, and with me today is
16      Special Agent Mike Garvey of the IRS.
17              THE COURT:  Thank you.  For Mr. Hershey?
18              MR. ARVIN:  Good morning, Your Honor.  Michael
19      Arvin representing Alan Timothy Hershey.  Mr. Hershey is
20      present with me in the courtroom in custody.
21              THE COURT:  Thank you.  And for Miss Molinar?
22              MS. CRUSER:  Yes, Your Honor.  I'm Amanda Cruser
23      and I am here with my client, Renee Molinar.
24              THE COURT:  Thank you.  This matter is set for
25      arraignment, discovery, and detention.  On the issue of
```

```
 1    arraignment, Mr. Arvin, has your client received a copy of
 2    the indictment?
 3              MR. ARVIN:  Yes, Your Honor.
 4              THE COURT:  Does he wish to have it read in its
 5    entirety?
 6              MR. ARVIN:  No, Your Honor, waive reading.
 7              THE COURT:  I'll accept a plea.
 8              MR. ARVIN:  Not guilty.
 9              THE COURT:  I'll accept a plea of not guilty to
10    each of the counts charged against Mr. Hershey, order the
11    matter continued for further proceedings.
12              And, Miss Cruser, has your client received a copy
13    of the indictment?
14              MS. CRUSER:  She has, Your Honor, and we waive --
15    waive reading at this time.
16              THE COURT:  And I'll accept a plea?
17              MS. CRUSER:  Not guilty.
18              THE COURT:  I'll accept a plea of not guilty to
19    the count charged against Miss Molinar, order the matter
20    continued for further proceedings.  Miss Molinar previously
21    was released on conditions.  We have detention as to
22    Mr. Hershey.  Miss Kaufman?
23              MS. KAUFMAN:  United States calls Mike Garvey.
24              THE COURT:  Special Agent, if you'd approach the
25    witness stand and raise your right hand, please.
```

4

1            MIKE GARVEY, GOVERNMENT WITNESS, SWORN

2            THE COURT:  Thank you.  Please be seated.  State

3    your full name and spell your last name, please.

4            THE WITNESS:  My name is Mike Garvey, last name is

5    spelled G-a-r-v-e-y.

6            THE COURT:  Miss Kaufman?

7            MS. KAUFMAN:  Thank you.

8                   DIRECT EXAMINATION

9    BY MS. KAUFMAN:

10    Q    Good morning, Mr. Garvey.  How are you employed, sir?

11    A    I'm a Special Agent with the Internal Revenue Service,

12    criminal investigation division.  I've been employed there

13    since 2003.

14    Q    Were you -- are you the case agent in the case that's

15    now before the Court?

16    A    I am.

17    Q    And in -- have you spent a substantial amount of time

18    investigating Timothy Hershey and the events forming the

19    basis of -- of the indictment charged?

20    A    Yes, I have.

21    Q    Did that include reviewing voluminous bank records,

22    interviewing numerous witnesses, reviewing IRS documents,

23    reviewing materials received from witnesses, public records,

24    and other business records?

25    A    Yes.

5

1    Q    Are you aware of any real estate owned by the

2    defendant, Timothy Hershey, in the State of Colorado?

3    A    No, I'm not.

4    Q    Are you aware of any real estate owned by Timothy

5    Hershey elsewhere?

6    A    No.

7    Q    What do you know about vehicles that he has been

8    driving?

9    A    The vehicles that he has been driving are registered to

10    other people, including Renee Molinar or his girlfriend, Pam

11    Long.

12    Q    The most recent, to whom is it -- what vehicle is it

13    and to whom is it registered?

14    A    It's a 2001 Dodge Ram truck and it's registered to Pam

15    Long.  And Mr. Hershey also drove a Hummer H2 that was

16    registered to Renee Molinar.

17    Q    To whom was the Dodge pickup truck registered prior to

18    being registered to Pam Long, do you know?

19    A    Renee Molinar.

20    Q    What was Renee Molinar's relationship with the

21    defendant starting as far back as 1998?

22    A    They were boyfriend and girlfriend.

23    Q    Did they live together for a period of years?

24    A    They did.

25    Q    Do you know of any vehicles that are registered in the

6

1    defendant's own name?

2    A    I do not.

3    Q    What do you know, if anything, about telephone numbers

4    that he has used?

5    A    He has used cell phones that were registered in other

6    people's names, including Charles Reichert.

7    Q    Who is Charles Reichert?

8    A    Charles Reichert is an unindicted co-conspirator in

9    this case.

10   Q    Is he referred to in the indictment under the initial

11   C.R.?

12   A    He is.

13   Q    Did he work for Mr. Hershey for a number of years?

14   A    Yes, he did.

15   Q    What do you know, if anything, about the defendant's

16   use of credit cards and/or his credit history?

17   A    I obtained the defendant's credit history from Equifax

18   and Equifax told me that there was no credit history for

19   Mr. Hershey according to their records.

20   Q    Has the defendant Hershey filed any federal income

21   taxes, tax returns in the recent past?

22   A    The last filed return for Mr. Hershey according to the

23   IRS records is for 1984.

24   Q    And about how old was he at that time?

25   A    19.

7

1    Q    How old is he now?

2    A    49.

3    Q    Do you have any reason to believe that Mr. Hershey has

4    access to large amounts of cash and/or other commodities

5    easily converted into cash?

6    A    I do.

7    Q    Just focusing now for the period of 2001 to 2011, what

8    is the basis of your belief generally?

9    A    It's my belief that Mr. Hershey had access to the

10   skimmed cash receipts from the Johnstown Liquor.  He would

11   instruct Miss Molinar on a daily basis how much cash to

12   remove and that cash was given to Mr. Hershey.

13   Q    Did Mr. Hershey -- who owned the Johnstown Liquor?  Is

14   -- first of all, is Johnstown Liquor still in operation?

15   A    It is.

16   Q    And who owned it in 1997?

17   A    Mr. Hershey did.

18   Q    Did he have a liquor license at that time?

19   A    He did.

20   Q    And had he had one and operated it for some years prior

21   to that?

22   A    Yes.

23   Q    Did he have a problem in 1997 with the state

24   authorities regarding licensing?

25   A    He did.  Mr. Hershey was caught purchasing stolen beer

8

1    and he was forced to sell the license to a bona fide

2    purchaser or have it revoked.

3    Q    And was he -- was the stolen beer purchased from

4    employees of a distributor?

5    A    It was.

6    Q    Did he also run afoul of turning over business records

7    as required?

8    A    Yes.  He was required to turn over some records and he

9    failed to do so.

10   Q    To whom did he then transfer the business?

11   A    The business was transferred to Renee Molinar in 1998.

12   Q    Did he lose his license at that time?

13   A    He did.

14   Q    Was he precluded by the order entered from working at

15   that liquor store?

16   A    He was.

17        THE COURT:  So you're saying he lost his license,

18   he sold his license, did he?

19        THE WITNESS:  He sold it to Renee Molinar.  Yes.

20        THE COURT:  Thank you.

21   Q    (BY MS. KAUFMAN) Did -- from that point forward until

22   about November of 2011 did Renee Molinar hold herself out as

23   the owner of Johnstown Liquor?

24   A    She did.  There was a brief period of time where the

25   liquor store was sold to another individual and then Miss

1    Molinar reacquired the business in 2001, and from 2001 to

2    2011 she operated the business according to the records for

3    the Liquor Board.

4    Q    And during that period based on witness interviews and

5    other evidence you've examined, what role did Timothy Hershey

6    play in the operations of Johnstown Liquor?

7    A    Mr. Hershey operated the business behind the scenes.

8    He would instruct Charles Reichert or Renee Molinar on a

9    daily or weekly basis, sometimes he would visit the business,

10   other times he would contact Mr. Reichert or Miss Molinar on

11   the phone about how to operate the business.

12   Q    What was -- excuse me.  In what forms did Johnstown

13   Liquor receive payment for the goods it sold at the store for

14   the period of the time of the conspiracy?

15   A    Johnstown Liquor received payments via cash, check or

16   credit card.

17   Q    And what have you learned that Renee Molinar would do

18   at the end of the day with the cash receipts from Johnstown

19   Liquor during that period?

20   A    Miss Molinar would remove a substantial amount of cash

21   from the cash receipts according to the instructions that

22   were given to her by Mr. Hershey.

23   Q    Would she prepare bank deposit slips and make deposit

24   into the business account?

25   A    Yes.

10

1 Q Did those deposits include the checks that were payable

2 to Johnstown Liquor as well as credit card receipts?

3 A Yeah.  They included checks payable to Johnstown Liquor

4 and a small amount of cash.

5 Q Okay.  And were the receipts from the credit cards also

6 deposited to the bank or does it not work that way?

7 A They were electronically deposited into --

8 Q All right.

9 A -- the bank account.

10 Q All right.  For example, for the period of time from

11 2007 through 2010 have you examined the business bank records

12 to determine what was the amount of cash deposited from the

13 gross receipts of the business during those four years?

14 A Yes, I have.

15 Q What was that amount?

**DEFENSE EXHIBITS 5 & 6**

16 A Approximately $470,000.

17 Q And how much did Johnstown Liquor actually take in in

18 gross receipts in cash during that same period, 2007 through

19 2010?

20 A Johnstown Liquor took in in cashed receipts

21 approximately $4.5 million.

22 Q And so based on the evidence that you've reviewed was

23 the difference then what you call skimmed off, taken by Miss

24 Molinar and given to Mr. Hershey?

25 A Yes.  The undeposited cash in this case for that time

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119  FAX 303-893-8305

11

1    period is approximately $4 million.

2    Q    How do you know what the actual gross receipts of cash

3    were or the goods sold during that period of time?

4    A    In May of 2013 Charles Reichert provided me a copy of

5    the point of sale records for the Johnstown Liquor.  It

6    includes the -- the Keystroke point of sale software program

7    which reflected every single sale out of the Johnstown Liquor

8    for the time period from 2001 until approximately August of

9    2011.

10   Q    And did he leave the employ there in September 2011?

11   A    He did.

12   Q    Did -- excuse me.  Did Mr. Hershey and Miss Molinar use

13   a double set of books operating Johnstown Liquor for the

14   period of the conspiracy?

15   A    They did.

16   Q    Can you explain what the different -- difference was

17   and what the two sets of books were?

18   A    I can.  The first set of books consists of the

19   Keystroke point of sale software which reflects every single

20   sale and the cost of goods sold for the time period.  The

21   second set of books consisted of a QuickBooks software

22   program and in that program the majority of the cash was

23   removed and that program was designed to mirror or match up

24   with the bank records as well as with the Colorado State

25   sales tax returns that were filed for the business.

12

1    Q    And so on the -- the Keystroke point of sale, was that

2    program set up by computer with the actual cash register

3    sales item by item?

4    A    It was.  It was hooked into the cash register.  It

5    would allow the business to track their inventory as well as,

6    you know, what was sold on a daily basis.

7    Q    And the QuickBooks, who -- who prepared the QuickBooks

8    reports that you've described which eliminated the dollars

9    that were skimmed off cash?

10   A    The QuickBooks was kept by Charles Reichert.

11   Q    And according to Mr. Reichert, at whose direction?

12   A    It was kept at Mr. Hershey's direction.  Mr. Hershey

13   would instruct Miss Molinar about how much cash to remove on

14   a daily basis.  Miss Molinar would then inform Mr. Reichert

15   about how much cash to take out of the figures that were

16   entered into the QuickBooks program.

17   Q    Were you able to determine what the defendant did --

18   both defendants did with some of the cash that you've

19   described, the $4 million plus just for the years 2007 to

20   2010?

21   A    I have.  They used the cash to acquire properties in

22   Johnstown, Milliken, and businesses in Gilcrest and Greeley,

23   Colorado, other liquor businesses.

24   Q    Who negotiated most of those purchases?

25   A    Mr. Hershey.

1    Q    And do you know that from talking to the sellers of

2    those properties?

3    A    I do.  I spoke with the sellers and in some cases I

4    also spoke with the purchasers when the businesses were

5    resold about who those people dealt with when they bought the

6    business.

7    Q    And what did they tell you?

8    A    They told me they dealt with Mr. Hershey.

9    Q    In what medium of exchange were those residences that

10    you've described purchased?

11    A    They were purchased for cash.

12    Q    In whose name?

13    A    In the names of Charles Reichert, Thea Seal, Tina

14    Stinint, Renee Molinar.

15    Q    And have you interviewed Thea Seal and Tina Stinint?

16    A    I have.

17    Q    Did they tell you whose money was used to purchase

18    those properties?

19    A    They told me it was Mr. Hershey's money that was used

20    to purchase the properties.

21    Q    And did they tell you generally why they did that?

22    A    They did it at Mr. Hershey's direction because he asked

23    them to.

24    Q    Were the transfers of funds that led up to the

25    purchases of those properties in cash in some instances

14

1    structured so as to avoid the bank's reporting requirements

2    of deposits or withdrawals of $10,000 or more to the IRS?

3    A    They were.

4    Q    Did defendant Hershey also arrange for -- do you

5    sometimes call those people that you've named as the buyers

6    nominees?

7    A    Yes.

8    Q    And why do you call them that?

9    A    Because they were the holder of the asset in name only.

10   They weren't the true owner of that asset or business.

11   Q    Were a number of those properties rental properties?

12   A    They were.

13   Q    And who received the rents from those properties?

14   A    Mr. Hershey.

15   Q    Did Miss Molinar also receive some of that?

16   A    She did.

17   Q    Did Mr. Hershey also arrange for -- for the -- one or

18   more of these nominees to buy two other liquor businesses

19   during the period of the conspiracy?

20   A    He did.

21   Q    What were those businesses?

22   A    Gilcrest Liquor in Gilcrest, Colorado, and Liquor Plus

23   in Greeley, Colorado.

24   Q    And who was the purchaser of Gilcrest Liquor?

25   A    The purchaser of Gilcrest Liquor was Tina Stinint.

15

1    She --

2    Q    And -- go ahead.  And how about Liquor Plus?

3    A    Liquor Plus was purchased -- the business was purchased

4    by Thea Seal.

5    Q    And were the properties upon which those businesses

6    were situated also purchased by nominees as you call them?

7    A    They were.  The land for the Gilcrest Liquor was

8    purchased by Charles Reichert and the -- I'm sorry, Thea

9    Seal, and the land for the Liquor Plus was purchased by

10   Charles Reichert.

11   Q    Were those businesses and properties -- most of the

12   properties ultimately resold?

13   A    They were.

14   Q    And to whom did the proceeds -- to whom were the

15   proceeds ultimately paid?

16   A    They were paid to Tim Hershey.  They were withdrawn in

17   the form of cash from the accounts that they were deposited

18   into.

19   Q    Did Renee Molinar also end up withdrawing a large

20   amount of cash as a result of this which we'll go into in a

21   minute?

22   A    She did, approximately $550,000.

23   Q    Let's talk just about a few of those properties.  The

24   first is 1914 Ruddy, R-u-d-d-y, Court, Johnstown, Colorado.

25            MS. KAUFMAN:  And may I approach the witness, Your

16

1     Honor?

2            THE COURT:  You may.  Do the defense counsel have

3     these materials?

4            MS. KAUFMAN:  Yes, sir.  I'll hand them out.

5            THE COURT:  Thank you.

6     Q    (BY MS. KAUFMAN) Can you identify Exhibit 1 for the

7     Court, please?

8     A    I can.  It's a summary of the funds that were used to

9     purchase the property on Ruddy Court.  On the bottom half of

10    the page are deposits into Charles Reichert's CBRI, Inc. bank

11    account.  You can see there's five consecutive deposits of

12    $9,999 between August 1st and August 5th, a transfer from an

13    account of Renee Molinar and another transfer from an account

14    Renee Molinar d/b/a Johnstown Liquor both on the 8th of

15    August.  Those -- those funds were used to purchase a

16    cashier's check that was used to pay off a loan of the owner

17    for the Ruddy Court property before it was transferred to

18    CBRI, Inc.

19    Q    Is CBRI, Inc. an entity created by Charles Reichert?

20    A    It is.

21    Q    Did Renee Molinar or Johnstown Liquor or Timothy

22    Hershey have any disclosed interest in the property purchased

23    at Ruddy Court?

24    A    No.

25            THE COURT:  Thank you.

17

**DEFENSE EXHIBIT 4**

1    Q    (BY MS. KAUFMAN) Directing your attention to what's

2    been marked as Exhibit 2 -- oh, excuse me.  I have some more

3    questions about Ruddy Court.  Who is Mr. Thompson?

4    A    Mr. Thompson was the seller of the Ruddy Court

5    property.

6    Q    And what did he tell you about what he saw at Johnstown

7    Liquor when he was discussing the sale of that property with

8    codefendant Molinar?

9    A    He told me that Miss Molinar wanted to purchase the

10   property, that it would have to be for cash, and Mr. Thompson

11   was skeptical about this property being purchased for cash

12   because it was worth a fair amount of money.  He then

13   accompanied Miss Molinar to the back of the store where Miss

14   Molinar showed him a safe full of cash.

15   Q    Let's move onto 512 12th Strreet, Gilcrest, Colorado.

16   And could you identify what you see there in Exhibit 2?

17   A    Yes.  This is a summary of the deposits into the CBRI,

18   Inc. bank account to generate the funds that were used to

19   purchase a cashier's check payable to the mortgage holder of

20   the seller of the property, Greenpoint Mortgage.  The seller

21   of the property in this instance was Michael Bodomdistal

22   (phonetics).  The summary indicates the balance in the

23   account on August 8th, 2005 of approximately $1,000 and then

24   four cash deposits of $9,999 between the 16th and the 19th,

25   and then two transfers on the 19th of 30 and $57,000 from

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

18

1    accounts under the control of Renee Molinar.

2    Q    Was CBRI then the purchaser of this property?

3    A    It was.

4    Q    And who did Charles Reichert tell you provided the

5    $9,999 each time?

6    A    He told me those funds were provided by Mr. Hershey.

7    Q    Did either Mr. Hershey or Miss Molinar or Johnstown

8    Liquor have any interest of record -- on public record of

9    ownership of this 12th street property?

**DEFENSE**
**EXHIBIT 3**

10   A    No.

11   Q    Who is Mr. Bodomdistal?

12   A    Mr. Bodomdistal was the seller of the 512 12th Strreet

13   property.  He told me that he had a conversation with

14   Mr. Hershey in the Gilcrest Liquor store about selling this

15   property to Mr. Hershey for cash and Mr. Bodomdistal was,

16   again, skeptical about this particular arrangement.  At that

17   point in time Mr. Hershey went into the back of the liquor

18   store and came out with a suitcase, laid it on the counter,

19   opened it up, and Mr. Bodomdistal told me it was full of cash

20   money.

21   Q    Has -- has Mr. Hershey -- was he actually arrested at

22   this particular location earlier this week?

23   A    He was.

24   Q    And is this the address that is on his driver's

25   license?

19

1    A    It is.

2    Q    And when did you learn that he was living there, what

3    month of this year?

4    A    Approximately April of this year I learned that

5    Mr. Hershey was living at this property.

6    Q    And who gave that information?

7    A    Benjamin Fisher.

8    Q    And how did he know that?

9    A    Benjamin Fisher was living with Mr. Hershey at the

10   time.

11   Q    At this address?

12   A    At this address.

13   Q    Okay.  According to your last review of the utilities

14   in the town of Gilcrest in May of 2014, who was listed on the

15   utilities billed for this particular property?

16   A    Benjamin Fisher/CBRI, Inc.

17   Q    Is Benjamin Fisher actually associated with CBRI, Inc.?

18   A    No, he is not.

19   Q    And what was the mailing address for Benjamin Fisher?

20   A    It was listed as a P.O. Box, P.O. Box 632 in Johnstown,

21   Colorado.

22   Q    And what do you know about that box?

23   A    I had the post office check the application for that

24   P.O. Box and they told me it was registered to Renee Molinar

25   and Johnstown Liquor at 21 South Parish in Johnstown,

20

1     Colorado.

2     Q     Directing your attention now, please, to Exhibit 3,

3     does this relate to 4403 Quartz Lane, Johnstown, Colorado?

4     A     It does.

5     Q     Is that another one of the properties that you

6     described which was purchased cash during the period of the

7     conspiracy?

8     A     That's correct.

9     Q     And what -- at the bottom of this particular chart you

10    have previous deposits to the Gilcrest Liquor, Inc. account.

11    Who was the listed owner of the Gilcrest Liquor, Inc. account

12    at that time?

13    A     Charles Reichert.

14    Q     And who was the listed owner of the Gilcrest Liquor

15    store at that time?

16    A     Charles Reichert.

17    Q     And what did Charles Reichert -- had someone else

18    purchased it prior to that and then transferred it to Charles

19    Reichert?

20    A     Yes.  Tina Stinint had initially -- was the owner of

21    the business.  She didn't get along with Mr. Hershey and the

22    business was then transferred to Charles Reichert.

23    Q     Was she one of those nominees that you named earlier?

24    A     She was.

25    Q     This particular exhibit shows third-party checks.  Did

1    John -- who was -- according -- according to the witnesses

2    who was actually operating Johnstown Liquor at that time?

3    A    Mr. Hershey.

4    Q    Did Johnstown Liquor, Gilcrest Liquor, as well as

5    Liquor Plus run check cashing businesses during this period?

6    A    They did.

7    Q    And particularly during the period when Mr. Hershey was

8    involved with the latter two?

9    A    That's correct.

10    Q    Did they as part of that business cash checks for

11    customers, for example, payroll checks?

12    A    They did.

13    Q    Did the businesses, therefore, have a certain need to

14    have a certain amount of cash on hand to cash those checks?

15    A    Yes, they did.

16    Q    And have you examined in detail the bank records which

17    show those checks at some point being deposited?

18    A    I have.

19    Q    And have you compared that to not only the point of

20    sale records that you received in 2013 from Mr. Reichert, but

21    also the QuickBooks and the bank records to determine how the

22    amount of cash compared -- was needed for cashing those

23    checks to the amount of cash that was being skimmed off at

24    the end of the day by Mr. Reichert and Miss Molinar?

25    A    I have.

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

22

1    Q     And what did you conclude?

2    A     I concluded that the cash that was skimmed off was

3    substantially greater than the cash that they would have

4    needed to cash checks.

5    Q     Now, in this particular example, Exhibit 3, how were

6    they using these third-party checks, the deposits of these

7    third-party checks?  What did they use those for in this

8    instance?

9    A     The third-party checks in this instance were used to

10   generate enough funds in this account in order to purchase

11   the money order to buy the property.  Instead of depositing

12   cash in this account they instead deposited third-party

13   checks to generate the funds they needed to purchase the

14   property.

15   Q     And did that have a tax consequence?

16   A     No.

17   Q     Perhaps I should say it this way.  Is the deposit of a

18   third-party check evidence of income?

19   A     No, it is not.

20   Q     Would deposit of cash be evidence of income?

21   A     Yes.

22   Q     Was this property then purchased by Charles Reichert in

23   this fashion?

24   A     It was.

25   Q     And what did Charles Reichert say -- who did -- who did

1    Charles Reichert say directed him to do this?

2    A    Mr. Hershey.

3    Q    Were these three properties that we've just described

4    those being Ruddy, 12th Street, and Quartz, did Mr. Reichert

5    at some point then transfer them?

6    A    He did.  In approximately January of 2012 Mr. Reichert

7    quitclaimed all of these three properties to Mr. Hershey for

8    no money.  It was just -- he quitclaimed them, didn't receive

9    anything in exchange for them.

10   Q    And when was Miss Molinar and Mr. Reichert, when were

11   they first questioned by criminal investigators in connection

12   with this case?  Was it before or after that transfer?

13   A    Prior to this transfer.  It was in July of 2011.

14   Q    So this was several months after that?

15   A    That's correct, approximately six months.

16   Q    At that point had Mr. Reichert quit working for

17   Mr. Hershey?

18   A    Yes.  Mr. Reichert stopped working at Johnstown Liquor

19   in approximately September of 2011.

20   Q    These three properties then were held in Mr. Hershey's

21   name; is that correct?

22   A    They were.

23   Q    And what did he do with them as well as four other

24   properties that still remained in Renee Molinar's name on

25   March 22nd of 2012?