## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 14-cr-00281-CMA-2

UNITED STATES OF AMERICA,

     Plaintiff,

v.

**2. RENEE MOLINAR,**

     Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Linda Kaufman, Assistant United States Attorney for the District of Colorado, and Defendant Renee Molinar, personally and through counsel Amanda Cruser, submit the following Plea Agreement pursuant to D.C. COLO. LCrR11.1.

### I. PLEA AGREEMENT

This agreement is entered pursuant to Fed. R. Crim. P. 11(c)(1)(B).

1. The defendant agrees to plead guilty to Count I of the Indictment, which charges a violation of 18 U.S.C. § 371, Conspiracy to Defraud the United States.

2. The parties agree that the Mandatory Victim Restitution Act applies, and that the Court shall order that the defendant make restitution pursuant to 18 U.S.C. § 3663A and 18 U.S.C. § 3664. The defendant agrees to pay restitution to the Internal Revenue Service ("IRS") in the amount of all federal taxes due and owing by *co-conspirator*

1


COURT EXHIBIT 1

Hershey for tax years 2001-2011 based on his ownership and operation of Johnstown Liquor.   The defendant agrees that the federal tax due and owing for restitution purposes is $1,024,951.30.   The defendant also agrees to pay $440,000.75 in restitution to the Colorado Department of Revenue, which equals the total amount that Johnstown Liquor collected in Colorado State sales tax during the period of the conspiracy, but failed to remit to the state. The defendant agrees that this restitution, totaling $1,464,952.05, results from her conduct described in the count of conviction, as well as any relevant conduct described in this agreement.  The parties agree that the order of restitution in this case should be joint and several with any order of restitution entered in Co-defendant Hershey's case, to the extent that the order in his case is based on unpaid taxes in connection with Johnstown Liquor.

3. The defendant agrees that she will sign any IRS forms deemed necessary by the IRS to enable the IRS to make an immediate assessment of the tax that she agrees to pay as restitution.

4. The defendant agrees not to file any claim for refund of taxes represented by any amount of restitution paid pursuant to this agreement.

5. The defendant agrees that nothing in this agreement shall limit the IRS in its lawful examination, determination, assessment, or collection of any taxes, penalties or interest due from the defendant for the time period covered by this agreement or any other time period for which the civil statutes of limitations on assessment and collection remain open at this date (26 U.S.C. §§ 6501 and 6502).  The defendant also agrees that this agreement, or any judgment, order, release, or satisfaction issued in

connection with this agreement, will not satisfy, settle, or compromise the defendant's obligation to pay the balance of any remaining civil liabilities, including tax, additional tax, additions to tax, interest, and penalties, owed to the IRS for the time period covered by this agreement or any other time period for which the civil statute of limitations on collection remains open at this date (26 U.S.C. § 6502).

6. The defendant also agrees to prepare, or have prepared, and to file complete and accurate tax returns for any outstanding tax years other than 2001-2011, which will be subject to separate IRS civil examination procedures.

7. The defendant agrees to provide truthful, complete and accurate information, and agrees to cooperate fully with the government as follows:

a. The defendant agrees to be fully debriefed, and to attend all meetings at which her presence is requested, concerning her participation in and knowledge of all criminal activities. All information given by defendant must be at all times complete and truthful.

b. The defendant agrees to make available to the government all documents and other material that may be relevant to the investigation and that are in the defendant's possession or control.

c. The defendant agrees to testify at any proceeding in the District of Colorado or elsewhere as requested by the United States Attorney's Office for the District of Colorado. All testimony given by defendant must be at all times complete and truthful.

d. The defendant consents to postponements of her sentence, as

3

requested by the government and as approved by the Court.

      e.    The defendant understands that if she provides untruthful information or testifies falsely, she is in breach of this Plea Agreement, and the government reserves the right to prosecute her for perjury, to withdraw its agreement in this case, and to bring additional charges.

      f.    The defendant understands that the government may make derivative use of and may pursue any investigative leads suggested by any statements made by, or other information provided by the defendant.

      g.    The defendant understands and agrees that if she later withdraws her plea of guilty, she shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the defendant's statements pursuant to this agreement, or any leads derived therefrom, should be suppressed or are inadmissible at any trial, hearing, or other proceeding.

      h.    In the event the defendant is ever a witness or presents evidence through other witnesses at trial or any other proceeding, and the defendant's statements or that evidence contradicts statements made during the defendant's debriefings, the defendant understands and agrees that the attorney or agent for the government may cross-examine the defendant and other witnesses concerning any statements made or other information provided by the defendant during the debriefings.  Evidence regarding such statements may also be introduced in rebuttal.

      8.  If the defendant cooperates completely and truthfully and enters an

unconditional plea of guilty Count 1 of the Indictment, the government agrees to the following:

        a.      The United States Attorney's Office for the District of Colorado will not charge defendant with any other violations of criminal law now known to this office.

        b.      If the defendant engages in no conduct that further implicates § 3C1.1, clearly demonstrates acceptance of responsibility for her offense, and timely notifies the authorities of her intention to enter a plea of guilty, thereby permitting the government and the Court to allocate their resources efficiently, the government agrees that a 3-point reduction in the offense level pursuant to § 3E1.1 for acceptance of responsibility is appropriate and agrees to make the appropriate motion at sentencing.

        c.      The government agrees that with the exceptions of statements regarding the defendant's participation in "crimes of violence," as defined in 18 U.S.C. § 16, and except as otherwise provided in this Plea Agreement, no statements made by or other information provided by the defendant during any debriefings will be used directly against her in any criminal proceeding.

        d.      Conditioned upon the defendant's guilty plea, and conditioned upon the defendant's full and truthful cooperation, the government intends to recommend that the Court depart downward of at least 20 percent from the bottom of the applicable guideline range as determined by the Court. The government will set forth the nature and extent of the defendant's cooperation, as well as the degree of the final requested departure, in a §5K1.1 motion which will address the factors set forth in § 5K1.1(a). The defendant understands that the government's determination of whether the defendant

has cooperated fully, truthfully, has provided substantial assistance, and the government's assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon her. Moreover, the defendant shall not be entitled to withdraw her plea if the government determines that she has not fully and truthfully cooperated and elects not to file the above-described motion.

      e.    The defendant recognizes that any departure requested by the government will be a recommendation to the Court and that the ultimate question of whether a departure is to be granted and the amount of that departure will rest solely within the discretion of the sentencing Court. The defendant also acknowledges that she will not be able to withdraw her guilty plea in the event the Court elects not to grant any downward departure request made by the government or rejects the amount of the departure requested by the government.

      9. The parties agree that whether or not the government files a downward departure motion pursuant to § 5K1.1 of at least 20 percent from the bottom of the applicable Guideline range, the defendant may file a motion for variance from a Guidelines sentence under 18 U.S.C. § 3553(a)(1) based on the history and characteristics of the defendant, and that the government may oppose that motion.

      10. The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the

sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upward, or (3) the Court determines that the total offense level  is greater than 23 and imposes a sentence above the sentencing guideline range calculated for that total offense level.  Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.

11. The defendant also knowingly and voluntarily waives her right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255.  This waiver provision, however, will not prevent the defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct.  Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from this waiver provision.

Note: "Total offense level" is the offense level that results after applying all adjustments from Guideline chapters 2-4, including acceptance of responsibility.

## II. ELEMENTS OF THE OFFENSE

### Conspiracy to Defraud the United States (18 U.S.C. § 371)

(1) An agreement by two or more individuals;

(2) To defraud the United States by impeding, impairing, obstructing, or

defeating the lawful function of the Internal Revenue Service of the Department of the Treasury in the computation, assessment, or collection of the revenue;

(3) An overt act in the furtherance of the conspiracy's objective;

(4)  Interdependence among the co-conspirators.

## III.  **STATUTORY PENALTIES**

The maximum statutory penalty for a violation of 18 U.S.C. § 371 is:  not more than 60 months' imprisonment, not more than a $250,000 fine or the greater of twice the gross gains or twice the gross loss, or both a fine and imprisonment; not more than 3 years' supervised release; a $100 special assessment fee; plus restitution.

If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## IV. **COLLATERAL CONSEQUENCES**

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.


## V.  **STIPULATION OF FACTS**

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider

the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is March 15, 2001.

The parties agree that the government's evidence would establish:

a. Johnstown Liquor is a retail liquor store located in Johnstown, Colorado. It was a sole proprietorship. As of March 15, 2001, Defendant Hershey had transferred it to Defendant Molinar, Molinar had transferred it to another individual for a short time, and had then reacquired it in her name. The defendants concealed from the Internal Revenue Service the fact that Molinar, who for much of the period of the conspiracy lived with Hershey, was the owner of Johnstown Liquor in name only, and that Hershey continued to control the operation of the business as its true owner. Defendant Hershey caused Defendant Molinar to hold herself out as the owner of Johnstown Liquor from ~~January 1, 2007~~ MARCH 15, 2001 through November 17, 2011.

b. Defendant Hershey directed Defendant Molinar and others as to how to operate the business, usually by speaking to them at his home or by speaking to them

9

by phone during business hours. Hershey dealt as much as possible in cash, and minimized his own use of bank accounts.

      c. Defendant Molinar opened bank accounts in the name of Johnstown Liquor over which she and individuals other than Hershey had signature authority. She also obtained a liquor license to operate Johnstown Liquor in her name.

      d. The defendants used a "Keystroke" point of sale record-keeping system which was connected to the store's cash registers and accurately recorded the business's cash, check, and credit card receipts. It also maintained an accurate record of the items sold, the cost of each item sold over the counter at Johnstown Liquor, and the price for which it was sold.

      e. The unindicted co-conspirator typically reconciled the sales receipts to the daily point of sale close-out reports, then placed the cash and checks in a safe in the store each night. At Defendant Hershey's direction, Molinar then removed a certain amount of the cash receipts before preparing the deposit slips and causing the bank deposits to be made. She gave that cash to Hershey.

      f. To conceal the existence of the cash receipts that had been removed, the defendants used a second set of books. Defendant Hershey directed the unindicted co-conspirator to make entries into a separate record-keeping system, the QuickBooks system, for this purpose. Defendant Hershey caused Defendant Molinar and the unindicted co-conspirator to use this second set of books for Johnstown Liquor from March 15, 2001 through about August 3, 2011.

g. Defendant Molinar would give the unindicted co-conspirator the Keystroke point of sale paperwork along with a handwritten note indicating the amount of cash she had removed for that day. Defendant Hershey instructed the unindicted co-conspirator to subtract that amount before entering the day's sales into the QuickBooks system. The QuickBooks record thus made it appear that the business's sales receipts were substantially less than they actually were.

h. The defendants also used the check-cashing business operated by Johnstown Liquor to conceal the true amount of the business's cash receipts. Johnstown Liquor was registered as a money service business and was authorized to cash checks. Numerous customers regularly presented their payroll and other third party checks at the store to be cashed, and were charged approximately 1% of the face amount of the check for this service.

i. Since cash would be needed on a daily basis to cash those checks, Johnstown Liquor could reasonably be expected to withhold some of its cash receipts from its bank deposits for that purpose. The defendants, however, removed far more of the store's daily cash receipts than was necessary to stock the business's cash registers and cash the next day's third-party checks. In fact, they removed most of the business's cash receipts before making the bank deposits. By removing this cash before it was deposited, the defendants prevented the IRS from being able to determine the true amount of the business's cash receipts by examining the banks' records. At the same time, the defendants accumulated large amounts of cash, which they never reported to the IRS.

11

j. The defendants did deposit the third-party checks which had been presented to Johnstown Liquor to be cashed. Only 1% of the face amount of those checks could be viewed as income by the IRS. Defendant Hershey and/or Defendant Molinar would determine how many of those checks should be deposited, and when. Instead of depositing them shortly after they were received, however, they held some of them for weeks or even months. They would then deposit them in amounts of their choosing – sometimes it was the amount needed to pay business expenses, sometimes it was the amount needed to purchase real estate.

k. Defendant Hershey filed no federal income tax returns for the entire period of the conspiracy and made no payments of income taxes to the IRS.

l. Defendant Molinar sent payments to the IRS for each tax year from 2001 through 2010, but filed no returns with those payments to explain the amounts she sent. The amounts she paid were roughly consistent with what she may have earned as an employee at Johnstown Liquor, but not consistent with her income as sole proprietor of the business. In 2008, after she had been confronted by an IRS revenue agent about her failure to file federal income tax returns, she filed returns for 2005 and 2006. On these, she falsely held herself out as the true owner of Johnstown Liquor and substantially understated the gross receipts of the business.

m. As with the bank records, the defendants also attempted to have records which would be available to the IRS conceal the true gross receipts of the business and confound the IRS's ability to determine their true tax liabilities. These included the

12

Colorado sales tax returns, the employer's federal tax returns, and the federal unemployment tax returns.

n. Johnstown Liquor was required to collect state sales taxes on its sales of beverages, file monthly sales tax returns, and to pay those taxes monthly to the Colorado Department of Revenue. Failure to do so would spur an investigation by the state. Defendant Hershey therefore directed the unindicted co-conspirator to create the business's monthly state sales tax returns using the understated sales figures from the QuickBooks records, and instructed him how to do so. Defendant Molinar executed checks drawn on a Johnstown Liquor account in amounts consistent with those returns to pay what she falsely represented to be the full amount due.  She then had the returns and checks sent to the Colorado Department of Revenue.  As a result, between 2001 and 2010, Johnstown Liquor collected $440,000.75 more in Colorado sales tax than it remitted to the Colorado Department of Revenue.

o. Johnstown Liquor was also required to withhold employment taxes from each employee's wages and submit those withholdings, along with an Employer's Quarterly Federal Tax Return (Form 941), to the IRS. In addition, Johnstown Liquor was required to pay a federal unemployment tax based on the total wages paid and file an annual Employer's Annual Federal Unemployment Tax Return (Form 940). For the entire period of the conspiracy, Defendant Molinar paid numerous employees their wages in cash or partly in cash; she paid others by check. Defendant Hershey determined which employees would be paid in cash. For wages paid in cash, Defendant Molinar counted the cash and prepared the cash packets for the employees.  Employees paid by check

were given check stubs showing deductions and were issued Form W-2 Wage and Tax Statements at year's end. Any employees paid entirely in cash were issued no Form W-2's.  Those who were paid partly in cash and partly by check received Form W-2's reflecting only the payments made by check.  Defendant Hershey told the unindicted co-conspirator that they didn't need to take out taxes for wages paid in cash, and that the unindicted co-conspirator shouldn't worry about it.

p. Defendant Molinar had an employee make entries into the QuickBooks payroll records which reflected the wages paid by check and the corresponding amounts withheld. The QuickBooks records thus created did not include the wages paid in cash. Nor did Molinar withhold any taxes from the wages she paid in cash.

q. Defendant Molinar had the QuickBooks payroll records delivered to an accountant for the purpose of preparing Johnstown Liquor's Form 941's, the W-2 Wage and Income Statements and annual summaries thereof, and the annual Form 940's. Neither Molinar nor Hershey asked the accountant to prepare their income tax returns.

r. Defendant Molinar subscribed the quarterly Form 941's and submitted them regularly to the IRS, along with payments which purported to be in the full amounts required. She also submitted the Form 940's regularly with payments which purported to be the full amount due. These forms and the corresponding payments were designed not only to conceal from the IRS the fact that Johnstown Liquor was paying certain employees in cash and withholding nothing in connection therewith, but also to convey the appearance of regularity and legitimacy to the IRS. To ensure that the IRS would

not discover this deceit, Defendant Hershey instructed the employees who were paid in cash not to file tax returns.

s. Having removed large sums of cash from the business's sales receipts, Defendant Molinar began making large cash purchases. These were the residential properties located at 225 Oak Street, Frederick, Colorado, 320 Rivera Lane, Johnstown, Colorado, 913 Elm St, Milliken, Colorado, and 113 Canal St., Johnstown, Colorado. Defendant Hershey negotiated the terms of the purchase of the Riviera Lane property and arranged for Molinar to purchase the Elm Street property.

t. To conceal Defendant Hershey's control of Johnstown Liquor, its cash receipts, his income, and his assets from the IRS, the defendants arranged for residential properties and businesses to be purchased in the names of nominees or in the names of nominee entities. These were: 213 S. Norma Ave., Milliken Colorado, 110 Katsura Circle, Milliken, Colorado, Gilcrest Liquor Incorporated, (hereinafter "Gilcrest Liquor"), 505 Railroad St., Gilcrest, Colorado, 1914 Ruddy Ct., Johnstown, Colorado, 512 12th St., Gilcrest, Colorado, 4403 Quartz Lane, Johnstown, Colorado, 295173 Corp. dba Liquor Plus, (hereinafter "Liquor Plus"), and 1020 11th St., Greeley, Colorado. The defendants funded these purchases either directly or indirectly and used cash to conceal the true source of those funds. To avoid triggering the banks' duty to report cash transactions of $10,000 or more to the IRS, the defendants sometimes caused the funding for these purchases to be funneled to the nominee buyer by way of consecutive

cash deposits to bank accounts in amounts just under $10,000.[1] Defendant Hershey had the nominees open bank accounts in their names or in the names of their entities. He also had some nominees obtain liquor licenses in their names.

u. Most of the residential properties the nominees purchased were income-producing rental properties. However, the defendants, not the nominees, received the rents. Defendant Hershey controlled the operation of the two businesses the nominees purchased, Gilcrest Liquor and Liquor Plus, but prevented his name from being associated with those businesses.

v. During the conspiracy, Johnstown Liquor had agreements with a cigarette manufacturer pursuant to which the store would receive rebates. The manufacturer was required to report the rebates to the IRS annually. The defendants caused the rebates to be reported under Hershey's social security number rather than under Molinar's. This maneuver was designed to divert any tax collection efforts by the IRS to Hershey, in whose name no discoverable assets were held.

w. Defendant Hershey ultimately arranged for Gilcrest Liquor, Liquor Plus, and most of the properties which were held in Molinar's or the nominees' names to be resold to third party purchasers[2]. Hershey negotiated the sales and he and/or Defendant Molinar received the proceeds. To conceal their receipt of the proceeds, he sometimes caused the funds to be deposited into bank accounts on which he was not named as a

---

[1] After IRS agents discussed their large cash withdrawals with Molinar on May 26, 2006, and she stated that she was aware that a form had to be filed for currency transactions exceeding $10,000.00, the defendants quit depositing cash in amounts just under $10,000.00.
[2] The last was quit-claimed by the nominee owner to Defendant Hershey just days before the defendants were arrested in this case.

signer, then had the nominee signer withdraw the proceeds in cash, and give the cash to him. Defendant Hershey caused one of his relatives to purchase seven of these properties on March 22, 2012.  At that time, four of them were held in Molinar's name; three had been quit-claimed by the unindicted co-conspirator to Hershey in January 2012. Hershey had Molinar withdraw the funds she received for these sales in cash, $541,868.00, and deliver it to him.  He  caused the money he had received from the sale of the three properties  which had been quit-claimed to him to be wired to the account of APMEX at J.P. Morgan Chase Bank to purchase  $294,964.03 and $164,350.82 worth of gold, silver, and platinum bars on April 17 and 24, 2012, respectively.

x. On July 6, 2011, IRS criminal investigators interviewed Defendant Molinar, specifically inquiring into her purchase of Johnstown Liquor and rental houses, the source of her funds, and her failure to file tax returns. They also discussed the whereabouts of the records for Johnstown Liquor. She falsely represented that they had been destroyed in a flood, knowing that numerous paper and computer records still existed. On the same day, they interviewed the unindicted co-conspirator about Johnstown Liquor, the unindicted co-conspirator's purchase of rental houses and Liquor Plus through a corporation. They asked him about the source of the funds he used to buy those items.  In or about July 2011, after the IRS agents had interviewed Molinar and the unindicted co-conspirator, Defendant Hershey directed them to remove all paperwork from the Johnstown Liquor store that would show what the actual sales were. They did. Between approximately July 6, 2011 and September 30, 2011,

17

Defendant Hershey removed boxes of cash from the Johnstown Liquor store.  In or about August 2011, Defendant Hershey instructed the unindicted co-conspirator to put a new computer system in Johnstown Liquor and to make sure that there were no old records on the new system.  The unindicted co-conspirator did so, but unbeknownst to the defendants, kept a copy of the Keystroke point of sale records.

y. In an attempt to remove Johnstown Liquor from the reach of the IRS, the defendants arranged to have title to it transferred to Johnstown Liquor, Inc., a company created by a young employee of the store. Defendant Molinar executed an Agreement to Sell Personal Property (the Johnstown Liquor business) to Johnstown Liquor, Inc./ that person on or about November 17, 2011; the transfer became effective January 1, 2012.  Since then,  that person, holding himself out as the owner of Johnstown Liquor, Inc., has been the owner of the business in name only, and Defendant Hershey has continued to control the operation of the business as its true owner.

z. As co-conspirator to Defendant Hershey, Defendant Molinar is responsible for the loss to the IRS which resulted from her conduct in the count of conviction.  She was involved in the operation of Johnstown Liquor, but not in the operation of the other stores owned by Defendant Hershey. The unreported taxable income from Johnstown Liquor is as follows:

| Johnstown Liquor: | Unreported Taxable Income |
|---|---|
| 2001 | — |
| 2002 | $      175,110.82 |
| 2003 | 206,980.78 |
| 2004 | 227,507.37 |
| 2005 | 190,594.64 |

| 2006 | 128,851.77 |
| 2007 | 345,017.62 |
| 2008 | 210,719.28 |
| 2009 | 267,226.73 |
| 2010 | 199,460.58 |
| 2011 | 168,751.54 |
| **TOTAL** | $ 2,120,221.12 |

The government has calculated the federal income tax on the above-listed unreported taxable income. To that it added the unpaid self-employment tax and the unpaid employment taxes on unreported wages paid in cash to determine the total federal taxes due and owing by Defendant Hershey in connection with Johnstown Liquor for tax years 2001-2011. The annual totals are as follows:

| **Johnstown Liquor** | **Federal Income Tax** |
|---|---|
| 2001 | $ 11,170.98 |
| 2002 | 76,101.39 |
| 2003 | 87,449.69 |
| 2004 | 126,513.03 |
| 2005 | 87,110.20 |
| 2006 | 70,055.12 |
| 2007 | 149,871.03 |
| 2008 | 105,961.93 |
| 2009 | 133,957.37 |
| 2010 | 104,500.75 |
| 2011 | 72,259.81 |
| **TOTAL** | $ 1,024,951.30 |

The total of those federal taxes due and owing is $1,024,951.30.

## VI.  ADVISORY GUIDELINE COMPUTATION AND 18 U.S.C. § 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed,

the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Court shall use the Guidelines Manual in effect on the date of sentencing, unless it determined that the application of that manual would violate the ex post facto clause of the United States Constitution. In this case, the Guidelines Manual the parties anticipate will be in effect on the date of sentencing, the 2014 Manual, incorporates an amendment to Application Note to 3 § 2T1.1, which took effect after the commission of the offense of conviction: Application Note 3, "Unclaimed Credits, Deductions, and Exemptions" (Amendment 774) became effective on November 1, 2013. Therefore, because the application of that note would preclude the Court from considering cash "under the table" payments to employees of Johnstown Liquor as business expenses, its application in this case would violate the ex post facto clause of the United States Constitution. If the Court determines that the use of the Guidelines Manual in effect on the date of sentencing would violate the ex post facto clause, it must use the Guidelines Manual in effect on the date of the offense of conviction was committed. § 1B1.11(b)(2). The offense of conviction, Count 1, ended on April 25, 2012.  The 2011 Guidelines Manual became effective November 1, 2011. The 2011 Manual should therefore be applied in its entirety.  § 1B1.11(b)(1).

A.      The base guideline for the violation of 18 U.S.C. § 371 in Count 1 is

§ 2T1.9(a)(1), which references § 2T1.4(a)(1).  The offense level is 22, pursuant to the

Tax Table at § 2T4.1(I): tax loss of more than $1,000,000 but less than $2,500,000,

namely $1,464,952.05 (the total of federal taxes owed in connection with Johnstown

Liquor plus the amount collected by Johnstown Liquor for Colorado Sales taxes and not

remitted to the Colorado Department of Revenue).

B.      The following specific offense characteristics  apply: The conduct in Count

1 was intended to encourage persons other than and in addition to co-conspirators to

violate   the   internal   revenue   laws   or   impede,   impair,   obstruct,   or   defeat   the

ascertainment,   computation,   assessment,   or   collection   of   revenue,   warranting   an

upward adjustment of 2 levels pursuant to §2T1.9(b)(2).

C.      The defendant willfully obstructed or impeded, or attempted to obstruct or

impede, the administration of justice with respect to the investigation of the instant

offense of conviction, and the obstructive conduct related to the defendant's offense of

conviction   and   any   relevant   conduct   and   to   a   closely   related   offense,   warranting   an

upward adjustment of 2 levels pursuant to § 3C1.1.

D.      No role in the offense or multiple count adjustments apply.

E.      The adjusted offense level for Count 1 would therefore be 26.

F.      The defendant should receive the 2-level adjustment for acceptance of

responsibility if she clearly demonstrates acceptance of responsibility for her offense,

pursuant to § 3E1.1(a). Further, if the defendant timely notifies the government of her

intention to enter a plea of guilty, thereby permitting the government to avoid preparing

for trial and permitting the government and the Court to allocate their resources efficiently, the government will file a motion so stating and recommending a 1-level downward adjustment pursuant to § 3E1.1(b). Assuming these adjustments apply, the resulting offense level would be 23.

      G.     The parties understand that the defendant's criminal history computation is tentative.  The criminal history category is determined by the Court based on the defendant's prior convictions.  Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

      H.     The career offender/criminal livelihood/armed career criminal adjustments would not apply.

      I.     *Based on a total offense level of 23, the advisory guideline range resulting from these calculations is 46-57 months.  However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 46 months (bottom of Category I) to 115 months (top of Category VI).  The guideline range would not exceed, in any case, the cumulative statutory maximum sentence applicable to the count of conviction.*

      J.     Pursuant to § 5E1.2, assuming the estimated offense level of 23, the fine range for this offense would be $10,000 to not more than the greatest of $100,000, twice the gross loss, or twice the gross gain, plus applicable interest and penalties.

      K.     Pursuant to § 5D1.2, if the Court imposes a term of supervised release, that term must be at least 1 year, but not more than 3 years.

L.      Pursuant to §5E1.1, the Court shall enter an order of restitution for the full amount of the victims' loss, as authorized under 18 U.S.C. § 3663A. The parties agree that the amount of restitution in Defendant Molinar's case is $1,464,952.05.

M.  The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. <u>ENTIRE AGREEMENT</u>

This document states the parties' entire agreement.  There are no other promises, agreements, side agreements, terms, conditions, understandings or assurances, express or implied.  In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: 5/7/15

RENEE MOLINAR
Defendant

Date: 5/7/ 15

AMANDA B. CRUSER
Attorney for Defendant

Date: 5/7/15

LINDA KAUFMAN
Assistant U.S. Attorney

4/29/15