## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 14-cr-281-CMA-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    **ALAN TIMOTHY HERSHEY**,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Linda Kaufman, Assistant United States Attorney for the District of Colorado, and Defendant Alan Timothy Hershey, personally and by counsel Michael Arvin, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I.  AGREEMENT

This agreement is entered pursuant to Fed.R.Crim.P. 11(c)(1)(A) and (B).

The defendant agrees to plead guilty to Count 1 of the Indictment, which charges a violation of 18 U.S.C. § 371, Conspiracy to Defraud the United States, and Counts 8 and 11 of the Indictment, each of which charges a violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2, Attempt to Evade or Defeat Tax.

The government agrees that at the time of sentencing, it will move to dismiss all remaining counts charged against the defendant in the indictment. The government also agrees that it will not file or pursue further criminal charges against the defendant based



COURT EXHIBIT 1

on information presently known to the United States Attorney's Office for the District of Colorado.[1]

The parties agree that the Mandatory Victim Restitution Act applies, and that the Court shall order that the defendant make restitution payments pursuant to 18 U.S.C. § 3663A and 18 U.S.C. § 3664.

The parties also agree that the total restitution in this case is $1,777,183.28, which is $1,337,182.53, the total of all federal taxes due and owing by the defendant and his businesses[2] for tax years 2001-2011— the federal income taxes, self-employment taxes, and employment taxes on unreported wages paid in cash, plus $440,000.75, which is the amount of state sales taxes collected by Johnstown Liquor and not remitted to the Colorado Department of Revenue from 2001 through 2010.  The parties agree that this total results from the defendant's counts of conviction as well as relevant conduct described in this agreement.

The defendant agrees to place $1,777,183.28 in trust with his attorney, Michael Arvin, no later than eight days prior to the sentencing hearing, which funds he agrees shall be used only to pay restitution in this case immediately upon the entry of this Court's order of restitution. The parties agree that the order of restitution in this case should be joint and several with any order of restitution to recover losses based on unpaid taxes in connection with Johnstown Liquor entered in Co-defendant Molinar's

---

[1] The United States Attorney's Office for the District of Colorado has recently been informed by defense counsel that the defendant has now filed his 2013 and 2014 federal individual income tax returns, but has not reported as his income any income from the business which is now known as Johnstown Liquor, Inc.

[2] The corporate taxes are for Gilcrest Liquor, Inc. and 295173 Corp dba Liquor Plus; the individual taxes are based on Johnstown Liquor and Corona's and More, LLC.

2

case.

The defendant agrees that nothing in this agreement shall limit the IRS in its lawful examination, determination, assessment, or collection of any taxes, penalties or interest due from the defendant for the time period covered by this agreement or any other time period for which the civil statutes of limitation on assessment and collection remain open at this date (26 U.S.C. §§ 6501 and 6502).  The defendant also agrees that this agreement, or any judgment, order, release, or satisfaction issued in connection with this agreement, will not satisfy, settle, or compromise the defendant's continuing to resolve any remaining federal civil tax liabilities, including additional tax, additions to tax, interest, and penalties, owed to the IRS for the time period covered by this agreement or any other time period for which the civil statute of limitations on collection remains open at this date (26 U.S.C.  § 6502).

The defendant agrees that he will sign any IRS forms deemed necessary by the IRS to enable the IRS to make an immediate assessment of the federal tax that the Court orders him to pay as part of the restitution. He also agrees to cooperate with the IRS in its assessment and collection of all liabilities to the IRS for the years 2001-2011.He further agrees not to file any claim for refund of taxes represented by any amount of restitution paid pursuant to this agreement.

The parties agree that neither will seek a guidelines departure, either upward or downward, but that the defendant may seek a variant sentence based on the factors set forth in 18 U.S.C. § 3553(a). The government agrees to recommend a sentence within

the guidelines range as determined by the Court.

The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statutes of conviction, (2) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upward, or (3) the Court determines that the total offense level is greater than 25 and imposes a sentence above the sentencing guideline range calculated for that total offense level. Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.

The defendant also knowingly and voluntarily waives his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. This waiver provision, however, will not prevent the defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct.

Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from this waiver provision.

Note: "Total offense Level" is the offense level that results after applying all adjustments from Guideline Chapters 2-4, including acceptance of responsibility.

## II.  ELEMENTS OF THE OFFENSES

The parties agree that the elements of the offenses to which this plea is being tendered are as follows:

### Conspiracy to Defraud the United States (18 U.S.C. § 371)

(1) An agreement by two or more individuals;

(2) To defraud the United States by impeding, impairing, obstructing, or defeating the lawful function of the Internal Revenue Service of the Department of the Treasury in the computation, assessment, or collection of the revenue;

(3) An overt act in the furtherance of the conspiracy's objective; and

(4) Interdependence among the co-conspirators.

### Attempt to Evade or Defeat Tax (26 U.S.C. § 7201)

(1) An attempt to evade or defeat a tax;

(2) A substantial amount of tax due and owing; and

(3) Willfulness.

## III.  STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. § 371 is:  not more

than 60 months' imprisonment; a fine of not more than $250,000 or the greater of twice the gross gain or twice the gross loss from the offense, or both a fine and imprisonment; not more than 3 years' supervised release; a $100 special assessment fee; plus restitution.

The maximum statutory penalty for each violation of 26 U.S.C. § 7201 is: not more than 60 months' imprisonment, not more than $100,000, or both imprisonment and a fine; the costs of prosecution; not more than 3 years' supervised release; a $100 special assessment fee; plus restitution.

The Court will impose a separate sentence on each count of conviction and may, to the extent permitted by law, impose such sentences either concurrently with or consecutively to each other.

If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

### IV.  COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V.  STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty pleas that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory

guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is March 15, 2001.

The parties agree that the government's evidence would establish:

a. Johnstown Liquor is a retail liquor store located in Johnstown, Colorado. It was a sole proprietorship. As of March 15, 2001, Defendant Hershey had transferred it to Defendant Molinar, Molinar had transferred it to another individual for a short time, and had then reacquired it in her name. The defendants concealed from the Internal Revenue Service the fact that Molinar, who for much of the period of the conspiracy lived with Hershey, was the owner of Johnstown Liquor in name only, and that Hershey continued to control the operation of the business as its true owner. Defendant Hershey caused

Defendant Molinar to hold herself out as the owner of Johnstown Liquor from ~~January 1, 2007~~ through November 17, 2011.

*LK  ATH  MArch 15, 2001*

b. Defendant Hershey directed Defendant Molinar and others as to how to operate the business, usually by speaking to them at his home or by speaking to them by phone during business hours. Hershey dealt as much as possible in cash, and minimized his own use of bank accounts.

c. Defendant Molinar opened bank accounts in the name of Johnstown Liquor over which she and individuals other than Hershey had signature authority. She also obtained a liquor license to operate Johnstown Liquor in her name.

d. The defendants used a "Keystroke" point of sale record-keeping system which was connected to the store's cash registers and accurately recorded the business's cash, check, and credit card receipts. It also maintained an accurate record of the items sold, the cost of each item sold over the counter at Johnstown Liquor, and the price for which it was sold.

e. The unindicted co-conspirator typically reconciled the sales receipts to the daily point of sale close-out reports, then placed the cash and checks in a safe in the store each night. At Defendant Hershey's direction, Molinar then removed a certain amount of the cash receipts before preparing the deposit slips and causing the bank deposits to be made. She gave that cash to Hershey.

f.   To conceal the existence of the cash receipts that had been removed, the defendants used a second set of books. Defendant Hershey directed the unindicted co-conspirator to make entries into a separate record-keeping system, the QuickBooks system, for this purpose. Defendant Hershey caused Defendant Molinar and the unindicted co-conspirator to use this second set of books for Johnstown Liquor from March 15, 2001 through about August 3, 2011.

g.   Defendant Molinar would give the unindicted co-conspirator the Keystroke point of sale paperwork along with a handwritten note indicating the amount of cash she had removed for that day. Defendant Hershey instructed the unindicted co-conspirator to subtract that amount before entering the day's sales into the QuickBooks system. The QuickBooks record thus made it appear that the business's sales receipts were substantially less than they actually were.

h.   The defendants also used the check-cashing business operated by Johnstown Liquor to conceal the true amount of the business's cash receipts. Johnstown Liquor was registered as a money service business and was authorized to cash checks. Numerous customers regularly presented their payroll and other third party checks at the store to be cashed, and were charged approximately 1% of the face amount of the check for this service.

i.   Since cash would be needed on a daily basis to cash those checks, Johnstown Liquor could reasonably be expected to withhold some of its cash receipts from its bank deposits for that· purpose. The defendants, however,

9

removed far more of the store's daily cash receipts than was necessary to stock the business's cash registers and cash the next day's third-party checks. In fact, they removed most of the business's cash receipts before making the bank deposits. By removing this cash before it was deposited, the defendants prevented the IRS from being able to determine the true amount of the business's cash receipts by examining the banks' records. At the same time, the defendants accumulated large amounts of cash, which they never reported to the IRS.

j.   The defendants did deposit the third-party checks which had been presented to Johnstown Liquor to be cashed. Only 1% of the face amount of those checks could be viewed as income by the IRS. Defendant Hershey and/or Defendant Molinar would determine how many of those checks should be deposited, and when. Instead of depositing them shortly after they were received, they held some of them for weeks or even months. They would then deposit them in amounts of their choosing – sometimes it was the amount needed to pay business expenses, sometimes it was the amount needed to purchase real estate.

k.   Defendant Hershey willfully filed no federal income tax returns for the entire period of the conspiracy, (for tax years 2001 through 2011), and made no payments of income taxes to the IRS. He knew of his legal duty to pay income tax based in part on the fact that he had previously filed income tax returns.

l.   Defendant Molinar sent payments to the IRS for each tax year from 2001 through 2010, but filed no returns with those payments to explain the amounts she sent. The amounts she paid were roughly consistent with what she may have earned as an employee at Johnstown Liquor, but not consistent with her income as sole proprietor of the business. In 2008, after she had been confronted by an IRS revenue agent about her failure to file federal income tax returns, she filed returns for 2005 and 2006. On these, she falsely held herself out as the true owner of Johnstown Liquor and substantially understated the gross receipts of the business.

m. As with the bank records, the defendants also attempted to have records which would be available to the IRS conceal the true gross receipts of the business and confound the IRS's ability to determine their true tax liabilities. These included the Colorado sales tax returns, the employer's federal payroll tax returns, and the federal unemployment tax returns.

n.  Johnstown Liquor was required to collect state sales taxes on its sales of beverages, file monthly sales tax returns, and to pay those taxes monthly to the Colorado Department of Revenue. Failure to do so would spur an investigation by the state. Defendant Hershey therefore directed the unindicted co-conspirator to create the business's monthly state sales tax returns using the understated sales figures from the QuickBooks records, and instructed him how to do so. Defendant Molinar executed checks drawn on a Johnstown Liquor account in

11

amounts consistent with those returns to pay what she falsely represented to be the full amount due.  She then had the returns and checks sent to the Colorado Department of Revenue. As a result, between 2001 and 2010, Johnstown Liquor collected $440,000.75 more in Colorado State sales tax than it remitted to the Colorado Department of Revenue.

o. Johnstown Liquor was also required to withhold employment taxes from each employee's wages and submit those withholdings, along with an Employer's Quarterly Federal Tax Return (Form 941), to the IRS. In addition, Johnstown Liquor was required to pay a federal unemployment tax based on the total wages paid and file an annual Employer's Annual Federal Unemployment Tax Return (Form 940). For the entire period of the conspiracy, Defendant Molinar paid numerous employees their wages in cash or partly in cash; she paid others by check. Defendant Hershey determined which employees would be paid in cash. For wages paid in cash, Defendant Molinar counted the cash and prepared the cash packets for the employees.  Employees paid by check were given check stubs showing tax withholdings and were issued Form W-2 Wage and Tax Statements at year's end. Any employees paid entirely in cash were issued no Forms W-2.  Those who were paid partly in cash and partly by check received Forms W-2 reflecting only the payments made by check.  Defendant Hershey told the unindicted co-conspirator that they didn't need to take out taxes for wages paid in cash, and that the unindicted co-conspirator shouldn't worry

about it. Defendant Molinar kept a handwritten record of the cash wage payments and other cash payments, documenting cash transactions which appeared neither in the Keystroke point of sale records nor in the QuickBooks records.

p. Defendant Molinar had an employee make entries into the QuickBooks payroll records which reflected the wages paid by check and the corresponding amounts withheld. The QuickBooks records thus created did not include the wages paid in cash. Nor did Molinar withhold any taxes from the wages she paid in cash.

q. Defendant Molinar had the QuickBooks payroll records delivered to an accountant for the purpose of preparing Johnstown Liquor's Forms 941, the W-2 Wage and Income Statements and annual summaries thereof, and the annual Forms 940. Neither Molinar nor Hershey asked the accountant to prepare their income tax returns.

r. Defendant Molinar subscribed the quarterly Forms 941 and submitted them regularly to the IRS, along with payments which purported to be in the full amounts required. She also submitted the Forms 940 regularly with payments which purported to be the full amount due. These forms and the corresponding payments were designed not only to conceal from the IRS the fact that Johnstown Liquor was paying certain employees in cash and withholding nothing in connection therewith, but also to convey the appearance of regularity and

legitimacy to the IRS. To ensure that the IRS would not discover this deceit, Defendant Hershey instructed the employees who were paid in cash not to file tax returns.

s. Having removed large sums of cash from the business's sales receipts, Defendant Molinar began making large cash purchases. These were the residential properties located at 225 Oak Street, Frederick, Colorado, 320 Rivera Lane, Johnstown, Colorado, 913 Elm St, Milliken, Colorado, and 113 Canal St., Johnstown, Colorado. Defendant Hershey negotiated the terms of the purchase of the Riviera Lane property and arranged for Molinar to purchase the Elm Street property.

t. To conceal Defendant Hershey's control of Johnstown Liquor, its cash receipts, his income, and his assets from the IRS, the defendants arranged for residential properties and businesses to be purchased in the names of nominees or in the names of nominee entities. These were: 213 S. Norma Ave., Milliken Colorado, 110 Katsura Circle, Milliken, Colorado, Gilcrest Liquor Incorporated, (hereinafter "Gilcrest Liquor"), 505 Railroad St., Gilcrest, Colorado, 1914 Ruddy Ct., Johnstown, Colorado, 512 12th St., Gilcrest, Colorado, 4403 Quartz Lane, Johnstown, Colorado, 295173 Corp. dba Liquor Plus, (hereinafter "Liquor Plus"), and 1020 11th St., Greeley, Colorado. The defendants funded these purchases either directly or indirectly and used cash to conceal the true source of those funds. To avoid triggering the banks' duty to report cash transactions of $10,000

or more to the IRS, the defendants sometimes caused the funding for these purchases to be funneled to the nominee buyer by way of consecutive cash deposits to bank accounts in amounts just under $10,000.00[3]. Defendant Hershey had the nominees open bank accounts in their names or in the names of their entities. He also had some nominees obtain liquor licenses in their names.

u. Most of the residential properties the nominees purchased were income-producing rental properties. However, the defendants, not the nominees, received the rents. Defendant Hershey controlled the operation of the two businesses the nominees purchased, Gilcrest Liquor and Liquor Plus, but prevented his name from being associated with those businesses. Each was a corporation. Defendant Hershey had Johnstown Liquor employees drive truck loads of alcohol purchased by Johnstown Liquor to Gilcrest Liquor, Liquor Plus, and Corona's and More, (another store owned by Hershey, a sole proprietorship) on a regular basis. Those stores did not pay for this liquor. When Liquor Plus was resold in 2007, a large amount of its inventory was delivered to Johnstown Liquor at Hershey's direction. Defendant Hershey has filed no federal income tax returns for any of those businesses and has paid no income taxes in connection with any of them.

---

[3] After IRS agents discussed their large cash withdrawals with Molinar on May 26, 2006, and she stated that she was aware that a form had to be filed for currency transactions exceeding $10,000.00, the defendants quit depositing cash in amounts of just under $10,000.00.

v.  During the conspiracy, Johnstown Liquor had agreements with a cigarette manufacturer pursuant to which the store would receive rebates. The manufacturer was required to report the rebates to the IRS annually. The defendants caused the rebates to be reported under Hershey's social security number rather than under Molinar's. This maneuver was designed to divert any tax collection efforts by the IRS to Hershey, in whose name no discoverable assets were held.

w. Defendant Hershey ultimately arranged for Gilcrest Liquor, Liquor Plus, and most of the properties which were held in Molinar's or the nominees' names to be resold to third party purchasers. Hershey negotiated the sales and he and/or Defendant Molinar received the proceeds. To conceal their receipt of the proceeds, he sometimes caused the funds to be deposited into bank accounts on which he was not named as a signer, then had the nominee signer withdraw the proceeds in cash, and give the cash to him. In 2012, Defendant Hershey negotiated the sale of seven of these properties to one of his relatives.  The sale occurred in March 22, 2012.  Four[4] of the seven had been held in Defendant Molinar's name; the other three[5] had been quit-claimed by the unindicted co-conspirator to Hershey in 2012. Hershey had Molinar withdraw the funds she received for these sales in cash, $541,868.00, and deliver it to him.  He caused

---

[4] 21 S. Parish Ave., Johnstown, Colorado, 320 Rivera Lane, Johnstown, Colorado, 913 Elm Street, Milliken, Colorado, and 113 Canal Ave., Johnstown, Colorado.
[5] 1914 Ruddy Court, Johnstown, Colorado, 512 12th Street, Gilcrest, Colorado, and 4403 Quartz Lane, Johnstown, Colorado

the money he had received from the sale of the three properties which had been quit-claimed to him to be wired to the account of APMEX at J.P. Morgan Chase Bank to purchase $294,964.03 and $164,350.82 worth of gold, silver, and platinum bars on April 17 and 24, 2012, respectively. The last properties held in a nominee's name, 213 S. Norma Ave., Milliken, Colorado, and 110 Katsura Circle, Milliken, Colorado, were quit-claimed to Defendant Hershey just days before the defendants were arrested in this case.

x.   On July 6, 2011, IRS criminal investigators interviewed Defendant Molinar, specifically inquiring into her purchase of Johnstown Liquor and rental houses, the source of her funds, and her failure to file tax returns. They also discussed the whereabouts of the records for Johnstown Liquor. She falsely represented that they had been destroyed in a flood, knowing that paper and computer records were still available. On the same day, they interviewed the unindicted co-conspirator about Johnstown Liquor, the unindicted co-conspirator's purchase of rental houses and Liquor Plus through a corporation. They asked him about the source of the funds he used to buy those items.  In or about July 2011, after the IRS agents had interviewed Molinar and the unindicted co-conspirator, Defendant Hershey directed them to remove all paperwork from the Johnstown Liquor store that would show what the actual sales were. They did. Between approximately July 6, 2011 and September 30, 2011, Defendant Hershey removed boxes of cash from the Johnstown Liquor store.  In or about August

2011, Defendant Hershey instructed the unindicted co-conspirator to put a new computer system in Johnstown Liquor and to make sure that there were no old records on the new system.   The unindicted co-conspirator did so, but unbeknownst to the defendants, kept a copy of the Keystroke point of sale records.

   y.  In an attempt to remove Johnstown Liquor from the reach of the IRS, the defendants arranged to have title to it transferred to Johnstown Liquor, Inc., a company created by a young employee of the store. Defendant Molinar executed an Agreement to Sell Personal Property (the Johnstown Liquor business) to Johnstown Liquor Inc./that person on or about November 17, 2011; the transfer became effective January 1, 2012.  Since then, that person, holding himself out as owner of Johnstown Liquor, Inc., has been the owner of the business in name only, and Defendant Hershey has continued to control the operation of the business as its true owner.

   z.  The federal taxes due and owing in this case are in large part based upon unreported taxable income from Johnstown Liquor and unreported gross income from Liquor Plus, Gilcrest Liquor, and Corona's and More.  The following chart reflects that unreported income:

### Unreported Income

|      | Johnstown Liquor | Liquor Plus | Gilcrest Liquor | Corona's and More |
|------|------------------|-------------|-----------------|-------------------|
| 2001 | —                |             |                 |                   |
| 2002 | $ 175,110.82     |             |                 |                   |
| 2003 | 206,980.78       |             |                 |                   |

| 2004 | 227,507.37 | | | |
|---|---|---|---|---|
| 2005 | 190,594.64 | | | |
| 2006 | 128,851.77 | $ 234,481.30 | $ 100,109.15 | |
| 2007 | 345,017.62 | 624,165.56 | 40,660.88 | $ 36,122.21 |
| 2008 | 210,719.28 | | 10,663.72 | 46,251.81 |
| 2009 | 267,226.73 | | 10,000.00 | 353.02 |
| 2010 | 199,460.58 | | | |
| 2011 | 168,751.54 | | | |
| **Total** | $ 2,120,221.13 | $ 858,646.86 | $ 161,433.75 | $ 82,727.04 |

The parties have calculated the federal income tax on the above unreported taxable income and unreported gross income, which includes income the defendant earned by transferring liquor purchased by Johnstown Liquor for subsequent sale through Gilcrest Liquor and Corona's and More. To that, they have added the unpaid self-employment tax and the unpaid employment taxes on unreported wages paid in cash to determine the total federal taxes due and owing by the defendant based on the counts of conviction and relevant conduct in this case. The following chart reflects the federal taxes owed by Defendant Hershey in this case:

### Federal Income, Self-Employment, and Employment Taxes Due and Owing by Defendant Hershey

| 2001 | $ 11,170.98 |
|---|---|
| 2002 | 76,101.39 |
| 2003 | 87,449.69 |
| 2004 | 126,513.03 |
| 2005 | 87,110.20 |
| 2006 | 154,457.83 |
| 2007 | 335,714.96 |
| 2008 | 138,690.81 |
| 2009 | 140,713.11 |
| 2010 | 107,000.72 |
| 2011 | 72,259.81 |
| **Total** | $1,337,182.53 |

## VI.   ADVISORY GUIDELINE COMPUTATION AND 18 U.S.C. § 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Court shall use the Guidelines Manual in effect on the date of sentencing, unless it determines that the application of that manual would violate the ex post facto clause of the United States Constitution. In this case, the Guidelines Manual the parties anticipate will be in effect on the date of sentencing, the 2014 Manual, incorporates an amendment to Application Note 3 to § 2T1.1, which took effect after the commission of the offenses of conviction. Application Note 3, "Unclaimed Credits, Deductions, and Exemptions" (Amendment 774) became effective on November 1, 2013. Therefore, because the application of that Note would preclude the Court from considering cash "under the table" payments to employees of Johnstown Liquor as business expenses, its application in this case would violate the ex post facto clause of the United States Constitution. If the Court determines that the use of the Guidelines Manual in effect on the date of sentencing would violate the ex post facto clause, it must use the Guidelines

Manual in effect on the date of the offense of conviction was committed. § 1B1.11(b)(2). The offenses of conviction ended on April 25, 2012 (Count 1) and on November 17, 2011 (Counts 8 and 11). The 2011 Guideline Manual became effective November 1, 2011. The 2011 Manual should therefore be applied in its entirety. § 1B1.11(b)(1).

A. **Base offense guideline**: The base guideline for the violation of 18 U.S.C. § 371 in Count 1 is § 2T1.9(a)(1), which references § 2T1.1. The offense level is 22, pursuant to the Tax Table at § 2T4.1(I): tax loss of more than $1,000,000 but less than $2,500,000, namely $1,777,183.28.

The parties agree that the base guideline for each violation of 26 U.S.C. § 7201 in Counts 8 and 11 is § 2T1.1(a)(1), with an offense level of 18 for Count 8, and 16 for Count 11, pursuant to the Tax Table at § 2T4.1 (G) and (F): tax loss of more than $200,000 but less than $400,000; tax loss of more than $80,000 but less than $200,000.

B. **Specific offense characteristics**: The conduct in Count 1 was intended to encourage persons other than and in addition to co-conspirators to violate the internal revenue laws or impede, impair, obstruct, or defeat the ascertainment, computation, assessment, or collection of revenue, warranting an upward adjustment of 2 levels pursuant to § 2T1.9(b)(2).

The offenses in Counts 8 and 11 involved sophisticated means, warranting an upward adjustment of 2 levels pursuant to § 2T1.1(b)(2).

C. **Role in the Offense**: In the offenses of conviction, the defendant was an organizer or leader of criminal activity, warranting an upward adjustment of 2 levels

pursuant to § 3B1.1(c).

D.    **Obstruction**: The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation of the instant offenses of conviction, and the obstructive conduct related to the defendant's offenses of conviction and any relevant conduct and to a closely related offense, warranting an upward adjustment of 2 levels for Counts 1, 8, and 11 pursuant to § 3C1.1.

E.    **Adjusted Offense Levels**: The adjusted offense level for Count 1 would be 22+2+2+2= 28, the adjusted offense level for Count 8 would be 18+2+2+2=24, and the adjusted offense level for Count 11 would be 16+2+2+2= 22.

The parties agree that Counts 1, 8, and 11 should be grouped together in a single group pursuant to § 3D1.2(b) and (d).  The offense level applicable to the group, pursuant to § 3D1.3(a) and (b), would therefore be 28.

F.    **Acceptance of Responsibility**: The defendant should receive the 2-level adjustment for acceptance of responsibility if he clearly demonstrates acceptance of responsibility for his offenses, pursuant to § 3E1.1(a). Further, if the defendant timely notifies the government of his intention to enter pleas of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently, the government will file a motion so stating and recommending a 1-level downward adjustment pursuant to § 3E1.1(b). Assuming these adjustments apply, the resulting offense level would be 25.

G.     **Criminal History**: The parties understand that the defendant's criminal history computation is tentative.   The criminal history category is determined by the Court based on the defendant's prior convictions.   Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

H.  ·   **Career Offender Adjustments**: The career offender/criminal livelihood/armed career criminal adjustments would not apply.

I.     **Guideline Range**: The advisory guideline range resulting from these calculations is 57-71 months.  However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably result in a range from 57 months (bottom of Category I) to 137 months (top of Category VI).

The guideline range would not exceed, in any case, the cumulative statutory maximum sentences applicable to the counts of conviction.

J.     **Fine Range**: Pursuant to § 5E1.2, assuming the estimated offense level of 25, the fine range for these offenses would be $10,000 to not more than the greatest of $100,000, twice the gross loss, or twice the gross gain, plus applicable interest and penalties.

K.     **Supervised Release**: Pursuant to § 5D1.2, if the Court imposes a term of supervised release, that term must be at least 1 year, but not more than 3 years.

L.     **Restitution**: Pursuant to § 5E1.1, the Court shall enter an order of

restitution for the full amount of the victims' losses, as authorized under 18 U.S.C. § 3663A. The parties agree that the amount of restitution in this case is $1,777,183.28.

M.    **General Agreements/Understandings**: The parties agree that neither will seek a guidelines departure, either upward or downward. No estimate by the parties regarding the guideline range precludes the defendant from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553(a) factors. The government agrees to recommend a sentence within the guideline range as determined by the Court.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

This document states the parties' entire agreement.   There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or

assurances, express or implied.  In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: **5/7/15**

Alan Timothy Hershey
Defendant

Date: **5/7/2015**

Michael F. Arvin
Attorney for Defendant

Date: **5/7/15**

Linda Kaufman
Assistant U.S. Attorney

5/5/15