IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 14-cr-281-CMA-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.     ALAN TIMOTHY HERSHEY,**

      Defendant.

---

**Government's Response to Motion for Sentence Variance
(Doc. No. 100)**

---

The United States of America, by and through undersigned counsel, respectfully responds to Defendant Hershey' s Motion for Sentence Variance (Doc. 100)[1] as follows:

1. The defendant has filed a motion for a variant sentence, requesting that the Court vary downward from the applicable Guidelines range. As grounds for his motion, the defendant argues that the requested sentence is warranted because: (1) this is his first conviction for a serious crime; (2) the risk that he, a 50-year old, will recidivate is low; and (3) he has attempted to pay restitution before sentencing.

2. The Court should deny this motion and, for the reasons set forth below, sentence him to a term of incarceration within the applicable guidelines range, as determined by the Court. A sentence of 32 months' incarceration would not be sufficient to comply with the statutory purposes of sentencing, as required. The

---

[1] "(Doc.__)" refers to particular docket entries in this case.

requested sentence would not reflect the seriousness of the defendant's offenses, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2).

## The Defendant's Criminal History and Age

3.   Although a sentencing court must weigh a defendant's age and criminal history in its analysis of the statutory sentencing factors, the fact that Defendant Hershey is 50 years old and that these felonies are his first is clearly outweighed by aggravated nature and circumstances of his offenses.   He masterminded a conspiracy to defraud the United States by impeding and obstructing the IRS in carrying out its functions of computing, assessing, and collecting income, employment, and other federal taxes. The conspiracy functioned successfully for over 11 years, from March 2001 through April 2012. The defendant willfully evaded the assessment of over $1.33 million in taxes during that time, and collected $440,000 of state sales taxes at Johnstown Liquor which he failed to turn over to the Colorado Department of Revenue.   He instructed his indicted and unindicted co-conspirators on a regular —virtually daily — basis through the years on how to assist in his fraud; beginning with Johnstown Liquor, he caused Co-defendant Molinar to hold herself out as owner of the business which he really owned and controlled; he had her acquire a liquor license in her name because he was prohibited from acquiring one in his name; he had her open and serve as signator on business bank accounts; he had her skim most of the cash receipts from Johnstown Liquor each night and deliver large portions of it to him upon request; he had her and the unindicted co-conspirator hide the cash receipts through daily entries in a double set

of books; he had her pay numerous employees cash wages under the table; he instructed those employees to not file tax returns; he had Co-defendant Molinar submit false reports of employees' wages to the accountant who prepared federal employment and unemployment tax returns; he had her and others act as nominees to purchase real properties with Johnstown Liquor's cash receipts; he had her structure cash deposits to certain bank accounts to facilitate those purchases; he caused other nominees to purchase Gilcrest Liquor, Inc. and Liquor Plus, obtain liquor licenses for those businesses, open bank accounts giving them signator authority, and hold themselves out as the true owners, when in fact, Defendant Hershey was the true owner and maintained control over those businesses; he paid no state or federal income taxes for the entire period, and filed no income tax returns; he had his co-conspirators create and file false state sales tax returns; and when it became apparent that a criminal investigation was underway in 2011, he removed boxes of cash from Johnstown Liquor and had his co-conspirators remove and conceal incriminating evidence from federal law enforcement authorities.

4.  The nature of these felony convictions clearly overshadows the fact that they are the defendant's first. They were neither impulsive nor opportunistic. They were deliberate, well-planned, and willful. The defendant relies heavily on statistical studies to persuade the Court that he is not likely to recidivate. His argument is basically that studies have shown that people that are age 50 at the time of conviction are less likely to reoffend, as are first offenders. The defendant's statistical arguments are not persuasive. The evidence in this case shows that Defendant Hershey is very intelligent, deliberate, and calculating. His behavior over many years

has revealed his ingrained distain for legal authority, whether it be in connection with state and local licensing matters (Doc.102 Para. 38) or state and federal tax matters. The essence of his offenses is the evasion of known legal duties and obstruction of law enforcement. There is nothing that indicates that any magic occurred between his 47th and 50th birthdays that has changed his character. Indeed, as will be discussed below, there is evidence that as of a few months prior to his July 2014 arrest in this case, he remained just as determined to preserve and conceal the fruits of his tax crimes. In the government's view, Defendant Hershey will very logically weigh the costs of reoffending against the benefits he has reaped and may still reap in the future. He doesn't need a mere warning. The sentence in this case must demonstrate to him and others that the cost of committing tax fraud truly outweighs the benefits.

5.  The defendant's motion and this response are framed within the context of 18 U.S.C. § 3553(a)(2)(B). However, one of the statutory factors to be considered is "any pertinent policy statement issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(4)(B). The Sentencing Commission recognized the specific need for sentences for tax offenses to deter criminal conduct, and fashioned the Guidelines accordingly:

> Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G., Part T-Offenses Involving Taxation, Introductory Commentary. A sentence in this case which varies downward from applicable Guidelines range, in addition to

being insufficient under §3553, would also defeat the considered purpose of the Commission.

### The Defendant's Attempt to Pay Restitution

6.   The defendant requests that the Court consider his attempt to make full restitution prior to sentencing as an additional ground for granting a downward variance from the applicable Guidelines range. The defendant's partial payment of restitution does not warrant a variance. The government is aware that the defendant has sold two properties (Norma and Katsura, Attachment 1, #6 and #7) and that his attorney has the proceeds of those sales (approximately $300,670.49) available for payment as restitution. In most cases, a pre-sentence payment in that amount would be impressive. In this case, it is not. The government's insistence on the defendant's full payment of restitution prior to sentencing was not based on its belief that Defendant Hershey would sell the Johnstown Liquor business prior to sentencing. It was based on evidence which shows that the defendant has sufficient cash and other readily fungible assets, namely, precious metals, to pay the agreed-upon amount of restitution, $1,777,183.28,  prior to sentencing.

7.   The government's position set forth in Doc. 95, Paragraphs 2-4, applies equally here.

8.   The evidence in this case has shown that the defendant has accumulated millions of dollars in cash and precious metals, and has taken extreme steps to conceal those assets. See Doc. 21 (Order of Detention, setting forth findings of Magistrate Judge Boland) and Doc. 36 (Order Denying Motion to Revoke Detention Order, setting forth findings of this Court after a de novo review). For 11 years, the

defendant operated Johnstown Liquor from behind the scenes. (Doc.102 Para. 11-12).   It had no competition in Johnstown, was open 7 days a week, and was successful. At the defendant's direction, most of Johnstown Liquor's cash receipts were removed on a daily basis and concealed. (Doc.102 Paragraphs 15,19). Indeed, post-indictment, Co-defendant Molinar produced a handwritten daily log that she had kept (i.e., a *third* set of books) which detailed what was done with that cash. It corroborates her statements and those of the unindicted co-conspirator that a large amount of that cash was given to the defendant. (See Doc.102 Para. 36 Unreported Income from the stores).   Much of the cash was used to purchase real properties and other liquor businesses (Doc.102 Paragraphs 29-30). Those income-producing rental properties and businesses were listed in Attachment 1, "Timeline of Property Transactions."   All but two of those properties, (Norma #6 and Katsura #7), were sold during the conspiracy. The purchase and sales prices are set forth on the second page. Defendant Hershey received the proceeds from those sales, in most cases, in cash.  (Doc.102 Para. 33). For example:

a) He received $850,000 from the sale of the Liquor Plus business, and $500,000 from the sale of the property on which it was located, 1020 11th St., Greeley. (Attachment 1, #12A and  #12B).  Both were sold on March 26, 2007 and the proceeds were deposited into accounts over which Defendant Hershey had no signature authority.   These proceeds were withdrawn in increments ranging from $39,500 to $95,000 by nominees and delivered in cash to the defendant between about November 2008 and March 2009.

b) Seven of the properties were sold by the defendants to Mr. Hershey's uncle, "R.H.", on March 22, 2012. Defendant Molinar received $541,868.00 for the sale of four properties that day[2], and Defendant Hershey had her withdraw the full amount in cash and deliver it to him. (Doc.102 Para. 33). A bank witness has described how the bank had to have that amount of cash specially delivered to the bank, and how Ms. Molinar put it in a back pack and left with it. She delivered it immediately to Defendant Hershey. With the proceeds he received on March 22, 2012 for the sale of three other properties[3], the defendant purchased $459,394.85 worth of gold, silver, and platinum bars. Id.

12.   The defendant's history reflects that he has maintained large stashes of cash through the years. For example:

a) In 2005, when trying to convince the wary seller of 512 12th Street, Gilcrest (Attachment 1, #10), that he could purchase the property in cash, the defendant displayed a suitcase full of cash that he had kept in a back room at the Gilcrest Liquor store.[4]

b) Similarly, the seller of the house at 1914 Ruddy Ct., Johnstown (Attachment 1, #9) stated that he spoke with a "Rachel"[5] at a liquor store in Johnstown in 2005, and that she told him that her boyfriend/husband would purchase the property, but that it would have to be a cash deal. When the seller asked her how he could believe or trust that she had enough cash for the deal,

---

[2] 21 S. Parish (#1A); Riviera (#3); Elm (#4); and Canal(#5).
[3] Ruddy (#9); 12th Street (#10); and Quartz(#11).
[4] The seller explained that although Mr. Hershey negotiated the purchase, someone else appeared at the closing and purchased the house in the name of "CBRI".  CBRI was an entity of a Hershey nominee.
[5] Actually, Renee Molinar

she took him to the back of the liquor store and pulled out a large bag of cash.[6]

c)    Defendant Molinar and the unindicted co-conspirator both independently reported that Defendant Hershey removed boxes of cash from Johnstown Liquor just after criminal investigators from the IRS questioned them in July 2011. (Doc.102 at 34).

d) Significantly, the defendant had $3,000,000 in $100 bills stashed in the basement of Johnstown Liquor in the spring of 2014, shortly before he was arrested and detained in this case. This evidence came to the government's attention on March 8, 2015, after a former employee of Johnstown Liquor was arrested by the Johnstown Police Department and questioned for a failed burglary attempt at the store on that date. He revealed that while working removing old shelving in the basement of the store about one year prior, a worker in the store told him Mr. Hershey was ordering him to stop what he was doing immediately. The employee then removed a piece of the shelving and found six beer "flats" containing rolls of $100 bills. He counted one of the rolls, counted the rolls in each flat, and calculated that each flat contained $500,000 in cash, for a total of $3,000,000 in cash. He concealed the flats in the heating ducts upstairs. Mr. Hershey arrived at the store, found the money missing, became irate, threatened the employees if the money weren't returned. The former employee said that Defendant Hershey had the employees search nearby dumpsters, then closed the store and interrogated them for hours, until the employee revealed where he had hidden the money.   In exchange, Defendant Hershey let the employee keep his job.  Co-defendant Molinar

---

[6] The property was purchased by CBRI, an entity of a Hershey nominee in 2005.

corroborated this story independently, recalling that Defendant Hershey had demanded the return of the "$2 million in cash."

14.   Finally, in his motion, the defendant states that he has learned "lessons" from being incarcerated in this case and is "carrying the heavy burden associated with his restitution obligation." (Doc.100 at 6). One only feels the burden of restitution if he feels obligated to pay it. The defendant, in the government's view, does not feel that obligation, but is instead hoping to appease the Court and the government with the restitution he has deposited with his attorney to date, receive a relatively light sentence, and be released from his sentence of imprisonment to still enjoy the monetary fruits of his crimes.

WHEREFORE, the government would respectfully request that the Court DENY the defendant's Motion for Sentence Variance.

Respectfully submitted,

JOHN F. WALSH
United States Attorney

By: s/ Linda Kaufman
Linda Kaufman
Assistant United States Attorney
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0404
E-mail: Linda.Kaufman@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that on this 15th day of March, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.


Michael F. Arvin
arvinlawoffices-ecf@arvin-denver.com

Amanda B. Cruser
abcruser@vfblaw.com


By: *s/Maggie Grenvik*
MAGGIE GRENVIK
Legal Assistant
United States Attorney's Office
1225 - 17th Street, Suite 700
Denver, CO 80202
Telephone: (303) 454-0154
Fax: (303) 454-0401
e-mail: Maggie.grenvik@usdoj.gov